K & T ENTERPRISES, INC., d/b/a Dairy Queen of Blissfield, and Tahani Khoury, Plaintiffs–Appellees, Cross–Appellants,

v.

ZURICH INSURANCE COMPANY, Defendant–Appellant, Cross–Appellee.

Nos. 94–2220, 94–2224.

United States Court of Appeals, Sixth Circuit.

Argued June 6, 1996.

Decided Oct. 9, 1996.

Stuart A. Sklar (argued and briefed), Jo Robin Davis (briefed), Michael H. Fabian (briefed), Fabian, Sklar & Davis, Farmington Hills, MI, for K & T Enterprises, Inc., Tahani Khoury in Nos. 94–2220, 94–2224.

John W. Knight, Southfield, MI, Ignatius John Melito (argued and briefed), Melito & Adolfsen, New York City, John J. McInerney, Leahy, Einsenberg & Fraenkel, Chicago, Il, for Zurich Insurance Company in Nos. 94–2220, 94–2224.

David S. Swartz, Bruce N. Elliott, Joseph W. Phillips, Conlin, McKenney & Philbrick, Ann Arbor, MI, for Society Bank, Michigan in No. 94–2224.

Before: MERRITT, CONTIE, and BOGGS, Circuit Judges.

BOGGS, Circuit Judge.

When is fire not the enemy of ice? When the 50% shareholder of a failing Dairy Queen franchise in Blissfield, Michigan torches that franchise outlet for profit, and his wife, who also owns 50% of the franchise, is still permitted by a district court upon a jury verdict to collect fire insurance proceeds for the damage caused by the arson. We reverse this decision, which, if left to stand, would encourage individuals to use the corporate veil to perpetrate insurance fraud.[1]

## I

Kareem and Tahani Khoury, husband and wife, purchased real estate in Blissfield upon which they built a Dairy Queen franchise incorporated as K & T Enterprises ("K & T"), with each of them holding half of the stock. To finance their business, they borrowed from the Society Bank, Michigan ("Society Bank") and granted the bank a mortgage on the property. Kareem was the president and sole officer. He worked in the cooking area of the Dairy Queen. He also kept the books and performed most management tasks, such as writing checks and negotiating with banks and lessors, while Tahani worked in the front of the store, decorating ice cream cakes and supervising the employees there.

---

1. Society Bank, Michigan was originally a party to this appeal, but Zurich Insurance Company's motion to dismiss the bank as a party was granted on February 3, 1995. Kareem Khoury stipulated to dismiss himself as a plaintiff before trial. The various Dairy Queen defendants in the action before the district court are not parties to this appeal.

The Khourys obtained fire insurance for K & T from the Zurich Insurance Company ("Zurich"). The policy named K & T as the insured party. Two parts of that insurance policy are particularly relevant to this case. The first provided that the policy is void in any case of misrepresentation by K & T, either before the insurance contract was signed or after, and the second provided that no loss or damage claim would be paid out if losses or damage resulted from a dishonest or criminal act that K & T committed, whether acting alone or in collusion with other persons.

The Khourys' Dairy Queen opened in July of 1989 and quickly began to fail. Blissfield is a town with a population of only 2,550, but has 10 restaurants, including one next door to the Dairy Queen. Moreover, an ice cream parlor is nearby. By January 1990, the Khourys were in default on their franchise payments and in danger of losing their franchise. The Dairy Queen's financial problems continued into the fall of 1990. During that period, Kareem Khoury asked Brent Sweeney, a former employee of the Dairy Queen, whether he would be willing to burn down the business in exchange for $20,000. Sweeney agreed, and early on the morning of January 22, 1991, using a key to the Dairy Queen and gasoline supplied by Kareem, Sweeney set fire to the restaurant. Before trial, the Khourys and Zurich stipulated that (including interest) the fire caused $383,424 in damage to the building, $114,794 in damage to business and personal property, and $5,000 in damage to business revenues.

Later on the morning of the fire, Sweeney went to the Khourys' home. Because he had burned his hands and eyebrows in the fire, he wore gloves and sunglasses inside the Khourys' home to hide the burns. Although Tahani was present, she was apparently not suspicious of Sweeney's behavior and appearance on this occasion. After that, Kareem and Tahani met Sweeney at a mall where Kareem made a partial payment to Sweeney. Sweeney testified that even after this meeting Tahani was still unaware of the plan to commit arson.

K & T, through both Kareem and Tahani, submitted sworn statements of proof of loss to Zurich on March 15, 1991. At the bottom of each statement was the following disclaimer: "The said loss did not originate by any act, design or procurement on the part of your insured, or this affiant; nothing has been done by or with the privity or consent of your insured or this affiant, to violate the conditions of the policy, or render it void...." Both Tahani and Kareem signed this form. During Zurich's investigation of the Khourys' claim, Tahani and Kareem both gave sworn testimony under oath, as required by the insurance policy, on September 12, 1991. When asked about the disclaimer, Kareem maintained that he did not set the fire at the Dairy Queen, pay Sweeney to do it, or instruct anyone else to set the fire.

Sweeney eventually confessed to arson and, after implicating Kareem, was sentenced to one year in prison. On October 31, 1991, Zurich, after finishing its investigation, denied liability under its policy issued to K & T for the damages caused by the fire, on the basis of false disclaimers in the sworn statements of loss and the two relevant parts of the insurance contract voiding the policy in the case of misrepresentations or criminal acts by the insured, K & T. K & T filed a complaint based on diversity jurisdiction against Zurich in the United States District Court for the Eastern District of Michigan on November 21, 1991, alleging breach of contract, violations of Michigan insurance statutes, negligence, and intentional infliction of emotional distress.

On July 16, 1992, Kareem Khoury was indicted in the United States District Court for the Eastern District of Michigan for violating 18 U.S.C. §§ 844(i) (arson) & 1341 (mail fraud for submitting the fraudulent proof of loss statements). He pled guilty to the mail fraud count and was sentenced to serve 21 months in prison.

The Khourys, Zurich, and Society Bank filed summary judgment motions in the civil action. The district court's order denied both the Khourys' and Zurich's motions, but granted Society Bank's motion. (Zurich originally appealed from this decision as well, but has since reached a settlement with Society Bank, and consequently dismissed it as a party to this appeal. Therefore, except in

connection with a subrogation issue to be discussed below, Society Bank's involvement in this case is not relevant to this appeal.) The district court held that there was a material factual dispute about whether Tahani knew of the arson when she signed the proofs of loss and testified under oath, and that under Michigan law her ignorance would permit K & T to recover, unless it could be proved at trial that Kareem had complete control of K & T. Kareem stipulated to withdraw as a plaintiff on May 24, 1994. A trial was then held on July 5–6, 1994. The jury found through special interrogatories that Tahani did not know about the arson, that Kareem did not exercise complete control over K & T, and that Zurich had acted in bad faith in denying K & T's claim.

Zurich filed a motion for judgment as a matter of law or alternatively for a new trial. On September 21, 1994, the district court granted the motion for judgment as a matter of law with respect to the jury's finding of bad faith, but denied the motion as to the other portions of the verdict. Zurich timely appealed on October 20, 1994. On October 27, K & T and Tahani Khoury cross-appealed the district court's reversal of the jury's bad faith finding. K & T moved in its brief for sanctions on the ground that Zurich's appeal was frivolous. Zurich then moved for sanctions in its reply brief against K & T on the ground that K & T's motion for sanctions was itself frivolous.

At oral argument, K & T's counsel represented to the court that Tahani now owns all of the shares of K & T. We can infer from K & T's brief, however, that this event occurred after the case was decided by the district court. K & T's Br. at 1.

This appeal presents five issues for resolution: (1) what standard of review applies to the district court's denial of summary judgment and denial of a Fed.R.Civ.P. 50(b) motion for judgment as a matter of law in this case; (2) whether the district court should have granted judgment as a matter of law to Zurich, since Michigan law does not require the arsonist(s) to dominate a corporation completely in order for innocent shareholders in the corporation to be denied recovery; (3) whether the district court should have grant-

ed judgment as a matter of law to Zurich because K & T made misrepresentations to Zurich in the sworn statements of proof of loss and in other sworn testimony; (4) whether the district court correctly granted Zurich's motion for judgment as a matter of law with respect to the issue of Zurich's alleged bad faith denial of liability to K & T; and (5) whether Zurich's appeal or K & T's motion for sanctions are frivolous and thus sanctionable.

## II.  ZURICH'S APPEAL

### A.  Standard of Review

█ Zurich does not make clear whether it is appealing from the district court's denial of summary judgment, from the denial of its motion for judgment notwithstanding the verdict or in the alternative for a new trial, or from both. We agree with the Fourth Circuit, which held in *Chesapeake Paper Prods. Co. v. Stone & Webster Eng'g Corp.*, 51 F.3d 1229, 1236 (4th Cir.1995), that, "[r]eviewing a Rule 50 determination is preferable to reviewing a summary judgment decision because the Rule 50 decision is based on the complete trial record and not the incomplete pretrial record available at summary judgment." Therefore, we also hold that in cases where an appellant made a Rule 56 motion for summary judgment that was denied, makes those same arguments in a Rule 50(a) motion at the close of evidence that was also denied, lost in front of a jury, then renewed its arguments in a rejected Rule 50(b) motion after the entry of judgment, we will review only the denial of the Rule 50(b) motion.

█ K & T implicitly argues that the standard of review of Zurich's assignments of error should be for "obvious and prejudicial error," because Zurich failed to object to the jury instructions given in this case, citing Fed.R.Civ.P. 51; *Batesole v. Stratford*, 505 F.2d 804, 807–08 (6th Cir.1974). Zurich disputes this factual allegation. Regardless of whether Zurich objected to the jury instructions in this case, Rule 51 does not prevent normal appellate review, since Zurich made all necessary arguments to preserve the issues raised in its appeal in its Rule 56 motion for summary judgment and in its Rule 50(b)

motion for judgment as a matter of law or alternately for a new trial. In *City of St. Louis v. Praprotnik*, 485 U.S. 112, 118–20, 108 S.Ct. 915, 921–22, 99 L.Ed.2d 107 (1988) (quoting *Springfield v. Kibbe*, 480 U.S. 257, 264, 107 S.Ct. 1114, 1118, 94 L.Ed.2d 293 (1987) (O'Connor, J., dissenting)) (citations omitted), the Supreme Court stated: "Although the same legal issue was raised both by those motions and by the jury instruction, 'the failure to object to an instruction does not render the instruction the "law of the case" for purposes of appellate review of the denial of a directed verdict or judgment notwithstanding the verdict [the two kinds of motions now unified in a Rule 50(b) motion].'" Hence, in this situation there has been no breach of the obligation to object to jury instructions, and the standard of review cannot be only review for "obvious and prejudicial error."

■ K & T and Zurich also explicitly disagree about the proper standard of review. Zurich originally urged *de novo* review, while K & T urged review for abuse of discretion. But, in its reply brief, Zurich changed its position to agree with K & T's assertion that abuse of discretion review applies here. The parties, however, cannot determine this court's standard of review by agreement. Such a determination remains for this court to make for itself.

The Supreme Court has expressly declined to establish a standard of review for Fed. R.Civ.P. 50 motions. *Dick v. New York Life Ins. Co.*, 359 U.S. 437, 445, 79 S.Ct. 921, 926–27, 3 L.Ed.2d 935 (1959). Our circuit has decided that the district court's application of Rule 50 will be reviewed *de novo*. *Hill v. Marshall*, 962 F.2d 1209, 1213 (6th Cir.1992), *cert. denied sub nom. Morris v. Hill*, 509 U.S. 903, 113 S.Ct. 2992, 125 L.Ed.2d 687 (1993).

In our own *de novo* review of Rule 50(b) motions, we must be careful to distinguish between Rule 50(b) motions based on a challenge to the facts as found by the jury and those based on purely legal grounds, which take the jury's findings at face value. We review these two types of challenges differently. Moreover, different standards of review apply depending on whether jurisdiction over the case is based on the existence of a federal question or on diversity of citizenship. Confusion exists here because the cases sometimes fail to make the necessary distinctions and because practitioners and courts sometimes insist on referring to a Rule 50 motion as a motion for a directed verdict or a motion for a judgment notwithstanding the verdict (JNOV). *See* Fed.R.Civ.P. 50 advisory committee's note (1991) (while continued use of the old terminology is mere "formal error," those terms are misleading and "freighted with inaccuracies"). Both the directed verdict and the verdict JNOV have been amalgamated into a Rule 50 motion for judgment as a matter of law. *See Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 583 (6th Cir.1994) (explaining how Rule 50(b) now encompasses the former JNOV).

The names for these older kinds of motions implied that it would be proper to make these motions based only on questions of the sufficiency of the evidence. A motion for judgment as a matter of law, however, can also be made on purely legal grounds, as Rule 50(b) makes clear: "Whenever a motion for a judgment as a matter of law made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion." The 1991 Advisory Committee's Notes to revisions in the Federal Rules of Civil Procedure indicate that one purpose of the terminology change was to make clear the linkage between Rule 50 and Rule 56 relating to summary judgment, both of which use the same phrase "judgment as a matter of law." Fed. R.Civ.P. 50 advisory committee's note (1991). *Compare* Fed.R.Civ.P. 50 *with* Fed.R.Civ.P. 56(c). *See Chesapeake Paper*, 51 F.3d at 1236 ("a party may appropriately move for judgment as a matter of law on discrete legal issues").

■ In a federal question case, the standard of review for a Rule 50 motion based on sufficiency of the evidence is identical to that used by the district court. The evidence should not be weighed. The credibility of the witnesses should not be questioned. The judgment of this court should not be substi-

tuted for that of the jury. Instead, the evidence should be viewed in the light most favorable to the party against whom the motion is made, and that party given the benefit of all reasonable inferences. The motion should be granted, and the district court reversed, only if reasonable minds could not come to a conclusion other than one favoring the movant. *Wehr v. Ryan's Family Steak Houses, Inc.*, 49 F.3d 1150, 1152 (6th Cir. 1995); *Phelps v. Yale Security, Inc.*, 986 F.2d 1020, 1023 (6th Cir.), *cert. denied*, 510 U.S. 861, 114 S.Ct. 175, 126 L.Ed.2d 135 (1993).

By contrast, when sitting in diversity, we review denial of a Rule 50 motion using the same standards applicable under the law of the forum state. *Kingsley Assoc., Inc. v. Del–Met, Inc.*, 918 F.2d 1277, 1280–81 (6th Cir.1990). This rule can be traced back to *Lovas v. GM Corp.*, 212 F.2d 805, 807 (6th Cir.1954). The *Lovas* rule is based on *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), which holds that because there is no general federal common law, state law provides the substantive law governing diversity cases. *Erie* may seem to call for the application of state law to determine the standard of review in all cases. The problem with such an across-the-board application of *Erie* is three-fold: First, *Lovas* is limited by its facts to review of questions of evidence sufficiency. Second, many states do not have a combined procedural rule governing judgments as a matter of law, continuing the practice of separate motions for directed verdicts and JNOV. Therefore, it is much more difficult to find the state law for the appropriate procedural mechanism that corresponds to the amalgamated Rule 50(b) motion. Finally, and most importantly, it is clear that we need show no deference to the *trial court's* assessment of the sufficiency of the evidence before a jury, even if state law so requires. Only the Tenth Circuit has sanctioned such deference. *See, e.g., Chicago Rock Island & Pac. R.R. Co. v. Howell*, 401 F.2d 752, 755 (10th Cir.1968). The consensus is that this position is entirely wrong. *See, e.g., Parker v. Prudential Ins. Co. of Amer.*, 900 F.2d 772, 776 (4th Cir.1990) (per curiam) (error of district court irrelevant to appeal because motion for a directed verdict raised a question of law); 9A Charles Alan Wright

& Arthur R. Miller, *Federal Practice & Procedure* § 2536, at 333 (1995) (collecting cases and commenting negatively upon the Tenth Circuit's approach). We hold that in diversity cases, a state law standard of review is applicable only when a Rule 50 challenge is mounted to the sufficiency of the evidence supporting a jury's findings. No deference is appropriate in diversity cases to a trial court's resolution of legal questions.

The framework for review of Rule 50 motions we set forth above is entirely consistent with *J.C. Wyckoff & Assoc., Inc. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1483–84 (6th Cir.1991). *J.C. Wyckoff*, although it noted the applicability of state law standards of review to motions for directed verdicts and JNOV, also indicated that when a trial court must resolve a legal issue in connection with such motions, such a ruling is to be reviewed *de novo*. Applying this analysis to the case at hand leads to the conclusion that *de novo* review is appropriate for Zurich's assignments of error based on their legal defenses to paying on the insurance contract. Zurich's initial instinct that a *de novo* standard should be applied here was correct.

To promote clarity in the standards of review applicable to Rule 50 motions we summarize our survey of the different types of cases above as follows: Legal determinations, whether made in a diversity case or in a federal question case, will always be reviewed *de novo*. Questions of evidence sufficiency will be reviewed as the forum state would review them in diversity cases, but will be reviewed under the standards articulated in decisions such as *Wehr* and *Phelps* in federal question cases.

Finally, we note that under Michigan choice of law principles governing contract disputes, we must balance the expectations of the parties against the interests of the other states involved. *Chrysler Corp. v. Skyline Indus. Servs., Inc.*, 448 Mich. 113, 528 N.W.2d 698, 703 (1995). No other states appear to have any interests in the outcome of this case except Michigan and, although Zurich is not a Michigan citizen, it concedes the applicability of Michigan law. Therefore,

we shall apply Michigan law to this dispute, just as the district court did.

## B. Arson and the Complete Control Test

Zurich's arson defense is based on the following clause in its policy issued to K & T: "We will not pay for loss or damage ... [r]esulting from any dishonest or criminal act that [K & T] or any of [its] partners commit whether acting alone or in collusion with other persons." The central question in determining whether Zurich has a defense under this arson clause is whether Kareem Khoury's and Sweeney's arson can be attributed to K & T. There are no Michigan Supreme Court cases and only one Michigan intermediate appellate case directly on point, *United Gratiot Furniture Mart, Inc. v. Basic Property Ins. Ass'n.*, 159 Mich.App. 94, 406 N.W.2d 239 (1987).

The *United Gratiot* court stated that, "[w]e hold that an insurance carrier may assert arson as a defense against the corporation's claim of fire loss if it is factually demonstrated that the individual who set or procured the setting of the fire exercised complete dominance and control over the affairs of the corporation." *United Gratiot*, 406 N.W.2d at 242. Limited to its facts, *United Gratiot* held only that, in a case where a shareholder *did* completely control a corporation, it was permissible for an insurance company to deny liability when that dominant shareholder committed arson. The facts of the case simply did not require the Michigan Court of Appeals to address the legal treatment of a situation where a 50% shareholder who was the president and sole officer, but did not completely control and dominate the corporation, deliberately burned corporate property. Zurich correctly points out that under *United Gratiot* complete control of the corporation is a sufficient condition to proper denial of liability, but notes that the facts of that case do not require our court to conclude that complete control is a necessary condition for proper denial of liability. Nevertheless, we recognize that *United Gratiot* can be read in a broader way to establish that *only* when it can be shown that a corporation is complete-

ly dominated and controlled by the arsonist shareholder can recovery be properly denied. Therefore, K & T has a colorable claim when it argues that *United Gratiot* is instructive of what the Michigan Supreme Court would do if faced with the legal question in this case. That question, in short, is whether an arson defense can succeed under Michigan law when the arsonist-shareholder is the dominant power in the corporation, but is not in exclusive control of it.

If policy were the only consideration, it would be easy enough for us to reject the broader interpretation of *United Gratiot* urged by K & T and accepted by the district court. But we are compelled to consider intermediate appellate court decisions as evidence of what a state's highest court would do when faced with particular legal questions. *See West v. AT & T Co.*, 311 U.S. 223, 236–37, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940) (forcing federal courts to consider cases handed down by intermediate state appellate courts under *Erie* ). Nevertheless, it is also true that we need not follow such precedent blindly where we are "convinced by other persuasive data that the highest court of the state would decide otherwise." *Clutter v. Johns–Manville Sales Corp.*, 646 F.2d 1151, 1153 (6th Cir.1981), *quoted in Pratt v. Brown Mach. Co.*, 855 F.2d 1225, 1234 n. 11 (6th Cir.1988).

It makes little sense to craft a rule that requires an insurance company to demonstrate that an arsonist completely controlled a corporation before allowing the insurance company to deny the corporation the right to collect on a fire insurance policy. First, it will be extremely difficult for any insurance company to demonstrate that an arsonist had *complete* control over a corporation. This is especially true in a corporation with a sizable management staff. Witness Zurich's inability to persuade a jury that Kareem completely controlled a corporation in which he was the sole officer. Second, such a rule would encourage some corporate officers deliberately to remain blissfully ignorant of any plans for arson by other corporate officers. Third, such a rule gives an incentive to a financially-distressed corporation plotting arson of the corporate property to disperse

control, or perhaps create formal titles giving the impression of dispersed control, in order to insure that fire insurance proceeds can be collected later. Fourth, and most distressingly, by making it more difficult for insurance companies to deny liability in cases of arson, it is clear that the ultimate effect of this rule would be to encourage arson for profit. In the language of the economics of insurance, a broad reading of *United Gratiot* expands the potential for moral hazard problems. *See generally* Richard A. Posner, *Economic Analysis of Law* 108 (4th ed. 1992). Moral hazard problems increase the costs of providing insurance and therefore the premiums that law-abiding insureds must pay. There is no reason to encourage this shifting of costs.

On the facts of this case, it is clear that Kareem will benefit by an application of the broad reading of *United Gratiot,* despite his criminal activity and deliberate misrepresentations to Zurich, violating the ancient equity maxim that no one should benefit from his own wrongdoing. K & T counters that it is Tahani's interests that are at stake in Zurich's refusal to pay—she is now the 100% shareholder. Tahani's current status as 100% shareholder is legally irrelevant, however, because she was not the sole shareholder when the case was decided by the district court. We are reviewing the denial of Zurich's Rule 50(b) motion and the state of affairs at the time that motion was denied is the only situation that is relevant to our decision. K & T also argues that Kareem will not benefit because Zurich has certain rights of subrogation against Kareem under *Danish Inn, Inc. v. Drake Ins. Co. of N.Y.,* 126 Mich.App. 349, 337 N.W.2d 63, 65 (1983). Although we do not decide this issue, *Danish Inn*'s subrogation holding seems to have been overruled or at least disparaged by *United Gratiot,* 406 N.W.2d at 241 n. 2 & 242, the principal case upon which K & T relies. In any event, it is clear that Kareem and Tahani are an *economic unit.* There is no evidence in this case that Kareem and Tahani are divorced or separated. Tahani will benefit if the district court's rejection of Zurich's arson defense is upheld. She would not be a litigant in this case if she did not expect to benefit from a favorable ruling by

this court. Tahani's benefit will at least partially translate into Kareem's benefit. Kareem may now be serving a prison term, but realistically, it is obvious that he will share in some fashion in the damage award ordered by the district court, whether that damage award is retained in the corporation's coffers or taken out of them by the 100% shareholder, his wife.

Given the strong policies militating against the broad reading of *United Gratiot* and the fact that allowing K & T to recover in this case would violate the well-entrenched principles of equity, we begin our analysis with a heavy presumption against adopting such a reading of *United Gratiot.* Nevertheless, in light of *Erie* and *West* we must carefully scrutinize *United Gratiot* to see what we can glean from that opinion that might help us predict what the Michigan Supreme Court would do in a case like this one.

We consider first the following treatise passage relied on heavily by the *United Gratiot* court:

> As a general rule, the wilful burning of property by a stockholder of a corporation is not a defense against the collection of insurance by the corporation; nor can a corporation be prevented from collecting the insurance because its agents wilfully set fire to the property without the participation or authority of the corporation or of all the stockholders of the corporation. On the other hand, if there is a conspiracy among the stockholders of the corporation to burn the property of the corporation, and the property is burned in pursuance of the conspiracy, such act is chargeable to the corporation and is a good defense to an action on a fire insurance policy. Likewise, under the principle of law that no one should be allowed to profit by his own wrong, an insured corporation will not be allowed a recovery on fire insurance policies where the incendiarist owns all or practically all of the stock in the insured corporation, or is in exclusive management of corporate property.

43 Am.Jur.2d *Insurance* § 494, at 565 (1982). This passage can be read to support either Zurich or K & T, just as *United Gratiot* can.

On the one hand, K & T can find support in the "exclusive management" language the passage uses. Based on this language, K & T can argue that it should be permitted to recover because the jury found that Kareem did not exclusively control the corporation. On the other hand, Zurich can argue that the quoted passage notes only that where an arsonist is in exclusive control, recovery can properly be denied. Based on this language, Zurich can argue that the question this case poses is no more decided by this language than is *United Gratiot* itself. The "exclusive" control language has no application to the situation where the arsonist's control is great, but not exclusive.

An examination of the cases cited in the American Jurisprudence entry and in *United Gratiot* does nothing to make more definite the prevailing standard in the common law. *Compare Miller & Dobrin Furniture Co. v. Camden Fire Ins. Co. Ass'n*, 55 N.J.Super. 205, 150 A.2d 276 (1959) (cited in *United Gratiot* ) (holding for the insurance company where the arsonist was 50% shareholder, as well as secretary, treasurer, and a director of the corporation) *with Minnesota Bond, Ltd. v. St. Paul Mercury Ins. Co.*, 72 Or.App. 187, 695 P.2d 579 (holding for the corporation where the arsonist was a 50% shareholder, president, and a director), *rev'd* 300 Or. 85, 706 P.2d 942 (1985) *and Erlin–Lawler Enters., Inc. v. Fire Ins. Exch.*, 267 Cal.App.2d 381, 73 Cal.Rptr. 182 (1968) (reversing trial court ruling for the insurance company where the arsonist was the president and 50% shareholder of the corporation).

In light of the indeterminacy in both the verbal formulation of the holding in *United Gratiot* and in the range of cases cited by *United Gratiot* either directly or indirectly, we hold that the Michigan Supreme Court would sustain Zurich's arson defense in this case as a matter of law. Without certainty that the common law of the states generally employs the exclusive control standard as a necessary condition for an insurance company to properly refuse to pay a corporation on a fire insurance policy when arson by a corporate officer or shareholder has occurred, we see no reason to assume that the Michigan Supreme Court would extend *United Gratiot*, rather than limit it to its core hold-ing. Because we can only decide cases under state law and not make state law, we decline to draw the line indicating to insurance companies exactly how much control a corporate officer and/or shareholder who has committed arson must possess before a refusal to pay a corporation on a fire insurance policy will be upheld. We hold only that this line is crossed when the arsonist, who is the president and sole officer of the corporation, as well as a 50% shareholder, is married to the other 50% shareholder and the couple is neither divorced nor separated and conduct the day-to-day operations of the corporation jointly.

K & T cites many cases, including some from Michigan courts, which hold that an insurance company cannot deny recovery on a fire insurance policy to one spouse simply because the other spouse commits arson. See, e.g., *Morgan v. Cincinnati Ins. Co.*, 411 Mich. 267, 307 N.W.2d 53 (1981). These cases are inapposite because they do not deal with the central question of when recovery can be denied to a *corporation* under a fire insurance policy; they only address the circumstances under which recovery can be denied to *married individuals* that are not bound together in the different and less protective relation that shareholders have to one another. Equitable considerations should and do play more of a role in non-corporate cases of arson.

Rules in the context of corporate arson must be capable of general applicability to all sorts of corporations. Many corporations, of course, are not wholly or even predominantly owned entirely by spouses. It makes sense to impose different risks on individuals in their capacity as investors than in their capacities as married individuals. Even if we were incorrect in our prediction that the Michigan Supreme Court would not import the rules applicable in the non-corporate context of married individuals into the corporate context, however, we think the rules governing individuals are sufficiently open-ended to permit the result we reach in this case. Most significantly, the driving concern behind the cases involving individuals in Michigan seems to be a desire to protect innocent spouses who are separated or divorced from

the arsonists, especially wives and ex-wives. *See Morgan*, 307 N.W.2d at 53 (innocent insured had instituted divorce proceedings against the arsonist); *Simon v. Security Ins. Co.*, 390 Mich. 72, 210 N.W.2d 322, 323 (1973) (same, although case involved invocation of fraud and false swearing defense by insurance company to prevent recovery under a theft insurance policy). "Certainly the day is long gone when women were lumped together with children and 'other incompetents' as requiring rigid protection from such rigors as separate ownership of property." *Simon*, 210 N.W.2d at 327. In this case, Tahani and Kareem Khoury are an economic unit—they are neither divorced nor separated. In cases like *Morgan* and *Simon*, the Michigan Supreme Court properly discarded outdated notions about women and recognized that husbands and wives should not be treated as an economic unit by the law when their interests diverge. The protections the common law and equity traditionally provide to insurers in cases of arson have not been discarded by the Supreme Court of Michigan, however.

### C. Misrepresentation

There are two possible legal routes to the conclusion that Zurich properly denied liability to K & T in this case. The district court, in its order denying summary judgment to Zurich, and in its order denying judgment as a matter of law after the trial had concluded, interposed *United Gratiot* to block both of these routes. *United Gratiot* appears to have no application to the clause in the policy barring recovery because of a material misrepresentation made in connection with the filing of a claim. The fraud and false swearing defense seems to be completely separable from an insurance company's arson defense. *See, e.g., J.C. Wyckoff & Assoc., Inc.*, 936 F.2d at 1478, 1486–88 (arson defense failed while fraud and false swearing defense succeeded); *Northern Assurance Co. v. Rachlin Clothes Shop, Inc.*, 32 Del. 406, 125 A. 184, 185–90 (1924) (fraud and false swearing defense failed while arson defense succeeded) (cited in *United Gratiot* ); *Miller & Dobrin Furniture Co.*, 150 A.2d at 284–86 (same) (also cited in *United Gratiot* ).

It is axiomatic that corporations can act only through their agents. *Mossman v. Millenbach Motor Sales*, 284 Mich. 562, 280 N.W. 50, 53 (1938). Therefore, if a corporation is to make a misrepresentation, it must be made by its agents. Moreover, "acts of officers and agents of a corporation, within the scope of their employment, are the acts of the corporation, and are evidence against it." *Attorney General ex rel. James v. National Cash Register Co.*, 182 Mich. 99, 148 N.W. 420, 424 (1914). More specifically, "a corporation is liable for the fraudulent conduct of its president where the conduct was within the scope of his authority." *People v. American Med. Ctrs. of Mich., Ltd.*, 118 Mich.App. 135, 324 N.W.2d 782, 793 (1982), *cert. denied sub nom. Fuentes v. Michigan*, 464 U.S. 1009, 104 S.Ct. 529, 78 L.Ed.2d 711 (1983). Clearly, filing insurance forms was within Kareem's authority—he was the only corporate officer. The Zurich insurance policy held by K & T included a clause which stated that the policy "is void in case of fraud by [K & T] at any time as it relates to this policy. It is also void if [K & T] ... intentionally conceal[s] or misrepresent[s] any material fact concerning ... [a] claim under this policy." When Kareem and Tahani signed the proof of loss statements, they were signing these in both their individual capacities and in their capacities as the agents of K & T. It can be argued that Kareem committed arson, however, only in his personal capacity and not in his capacity as an agent of K & T.

K & T argues that the fraud and false swearing defense is not separable from the arson defense in cases involving an innocent insured because it will almost always be the case that the arsonist who is a corporate shareholder or officer will lie to the insurance company about his involvement in the fire after the fact. Fraud and false swearing in this respect will always accompany the act of arson for profit. Moreover, K & T points out that insurance companies are required under Michigan law to include a standardized fraud and false swearing clause. *See* Mich. Comp. Laws Ann. § 500.2833(c) (West 1995) (fire insurance policies must contain a provision stating that the policy may be void in the case of misrepresentation, fraud, or concealment). There-

fore, K & T reasons, *United Gratiot* should be read implicitly to bar fraud and false swearing defenses to the same extent it bars arson defenses. However, a corporation has an obligation to verify the truth of representations made by its shareholders and officers. Fraud encompasses both affirmative misstatements and omissions that make otherwise truthful affirmative statements misleading. *General Elec. Credit Corp. v. Wolverine Ins. Co.*, 420 Mich. 176, 362 N.W.2d 595, 601 (1984). A corporation facing the situation where a fire was deliberately set by a non-officer and 5% shareholder might properly be denied recovery under the fraud and false swearing defense, even though an arson defense is extremely weak on these hypothetical facts because the arsonist's extent of control over the corporation is minimal, if the corporation came to know or should have come to know that this shareholder-arsonist was responsible for the fire. A separate sort of wrongdoing vitiating the policy has arguably occurred.

This area of the law is even murkier in Michigan than the more basic law governing the arson defense alone, however. Because of K & T's reasonable argument that the arson and fraud and false swearing defenses should at least at times be inseparable and because we have already held that Zurich's arson defense should have prevailed in this case, we need not address the merits of Zurich's possibly separate fraud and false swearing defense.

## III. K & T'S CROSS–APPEAL ALLEGING ZURICH ACTED IN BAD FAITH

K & T cross-appeals the district court's grant of judgment as a matter of law to Zurich on the issue of whether Zurich acted in bad faith in denying liability to K & T. Because we have held that Zurich properly invoked an arson defense, it is obvious that Zurich's refusal to pay K & T on the insurance policy was not in bad faith. For the purposes of rejecting K & T's cross-appeal, we have assumed that a valid cause of action exists under Michigan law that allows a claim of bad faith to be brought against an insurance company when it refuses to pay on an insurance contract. Our resolution of this case should not be taken to mean, however, that we believe that such a cause of action exists.

## IV. FRIVOLOUSNESS

K & T has requested an award of sanctions in its brief under Fed. R.App. P. 38 on the ground that Zurich's appeal was frivolous. In its reply brief, Zurich made a similar request for sanctions against K & T on the theory that K & T's motion for sanctions against Zurich was itself frivolous and that K & T's cross-appeal was frivolous. We decline to consider either of these requests as they were not made in a separately filed motion as Rule 38 requires.

## V

The district court's denial of Zurich's Rule 50(b) motion is **REVERSED**.