John HUDSON, Plaintiff–Appellee,

v.

INSTEEL INDUSTRIES, INC.; Insteel Wire Products Company; H.O. Woltz, III, Defendants–Appellants.

No. 99–6217.

United States Court of Appeals, Sixth Circuit.

Feb. 23, 2001.

---

Before KEITH, BOGGS, and COLE, Circuit Judges.

## OPINION

R. GUY COLE, JR., Circuit Judge.

Defendants–Appellants Insteel Industries, Inc. ("Insteel"); Insteel Wire Products Company; and H.O. Woltz, III (collectively referred to herein as "Defendants"), appeal the jury verdict for Plaintiff–Appellee John Hudson ("Hudson") in this action for age discrimination in employment and promissory fraud. Defendants assign error to: (1) the district court's refusal to grant Defendants' motion, pursuant to FED. R. CIV. P. 50, for judgment as a matter of law, or, in the alternative, a new trial,

with respect to Hudson's age discrimination claim; (2) the district court's refusal to grant Defendants' motion, pursuant to FED. R. CIV. P. 50, for judgment as a matter of law, or, in the alternative, a new trial, with respect to Hudson's promissory fraud claim; and (3) the district court's refusal to grant Defendants' motion, pursuant to FED. R. CIV. P. 59, to amend the judgment, with respect to the jury's $301,500 award to Hudson on his promissory fraud claim, which award Defendants argue was duplicative and excessive. For the reasons that follow, we AFFIRM the order of the district court in its entirety.

## I. BACKGROUND [1]

Insteel Industries, Inc. is a manufacturer of various wire products. Its subsidiary, Insteel Wire Products Company, operates two adjacent manufacturing facilities located in Gallatin, Tennessee: the Tennessee Wire Plant and the PC Strand Plant. In 1992, Hudson, then 48 years old, began negotiations with Insteel's president and chief executive officer, H.O. Woltz, III, to use his business plan for construction of a plant. Some months later, in August 1992, Insteel decided to use Hudson's plan for construction of a PC strand plant in Gallatin, Tennessee.

### A. Pre–Employment Negotiations

Woltz offered Hudson a position with Insteel as general manager, responsible for the development of Insteel's PC strand operation, which Hudson agreed to accept if Insteel provided him with an ownership interest in the venture. By letter dated July 6, 1992, Woltz offered Hudson an "employment arrangement," part of which included an "equity participation" plan. Hudson rejected Insteel's initial proposal for various reasons, principally because Insteel refused to offer him employment for a term of seven years. Hudson believed that a minimum of five years was necessary for the plant to generate significant profits.

By letter dated September 9, 1992, Woltz provided Hudson with information concerning Hudson's potential employment with Insteel. Hudson claims that the letter was merely another proposal with terms to be accepted or rejected by Hudson; Woltz contends that the letter memorialized the terms agreed upon at a September 4, 1992, meeting. Hudson alleges that he accepted Insteel's offer to hire him to implement the PC strand plan in exchange for: (1) a term of seven years' employment, (2) 5% of the profits for seven years, and (3) a position as the general manager of the PC Strand Plant. Insteel denies that any such agreement was ever reached.[2]

### B. Employment Relationship

Hudson began work with Insteel on September 28, 1992. When he requested the written employment contract reflecting the terms upon which he and Insteel had agreed, he was allegedly told that it was not yet ready. Hudson claims that he was not provided the final contract until Woltz called him into his office to sign it. The

---

1. We view all facts in the light most favorable to the jury's verdict. *See Coal Resources, Inc. v. Gulf & W. Indus.*, 865 F.2d 761, 767 (6th Cir.1989).

2. Insteel does not dispute that it agreed to allow Hudson and a business associate, Richard Wagner, to participate in a seven-year profit-sharing plan conditioned on Hudson's and Wagner's continued employment with Insteel. Disagreement stems from whether the parties agreed: (1) to enter into an employment relationship for a term of years, and (2) to terminate that relationship only "for cause."

document, entitled "Supplemental Profit Sharing Plan ('SPSP')," according to Hudson, memorialized the terms to which the parties had agreed prior to Hudson's acceptance of employment with Insteel. Insteel disputes that the SPSP constituted an employment contract—it was precisely what it purported to be, *i.e.*, the terms of the profit-sharing plan agreed upon by the parties—and argues that even if the SPSP were an employment contract, nowhere in it is there a term that provides that Hudson could be terminated only for cause or for serious misconduct. Hudson and Wagner signed the SPSP on October 28, 1992.

Hudson, as general manager, directed the construction of the PC Strand Plant, which was completed and operational by January 1994, and described in Insteel's annual report as "a world class facility" that became "profitable more quickly than any other new venture ever undertaken by Insteel." Woltz, pleased with Hudson's performance in overseeing the construction of the PC Strand Plant, promoted Hudson to General Manager of Tennessee Operations in January 1995, in which capacity, Hudson was responsible for the management of both plants.

In an August 1995 evaluation, Executive Vice President Dale Duensing praised Hudson's management, leadership, and organizational skills, gave Hudson a "superior" rating—the highest rating possible—and recommended a five-percent pay increase for Hudson. Although Insteel alleged that during the latter part of 1995, and throughout 1996, the Tennessee Wire Plant demonstrated a lack of improvement, as indicated by so-called "key performance measurements," Hudson argued that during this period, upper-level management never criticized his performance and in fact was complimentary of his work. Duensing himself testified that he called Hudson on two occasions to congratulate

him for the Tennessee Wire Plant's performance. On March 24, 1997, after discussions between Duensing and Woltz about the Tennessee Wire Plant's continued lack of improvement, Woltz terminated Hudson and replaced him with Jim Herman, a man in his thirties. Hudson was 53 years old. Pursuant to the SPSP, Insteel paid Hudson $53,000 in profits.

Hudson brought claims against Defendants alleging age discrimination in violation of the Age Discrimination in Employment Act ("ADEA") and the Tennessee Human Rights Act ("THRA"), breach of contract, and promissory fraud. The matter was tried before a jury. Defendants filed a motion for judgment as a matter of law at the conclusion of Hudson's case, and again at the end of trial; Hudson filed a motion for judgment as a matter of law at the conclusion of Defendants' case. The district court denied both parties' motions and submitted the case to the jury, which returned a verdict in favor of Hudson on the age discrimination and promissory fraud claims, and in favor of Defendants on the breach of contract claim. The jury awarded Hudson $57,575 in back pay and $150,000 in lost profits under the SPSP for his age discrimination claims, and $301,500 in compensatory damages for his promissory fraud claim. Defendants filed the motions that are at issue in the instant appeal, which were denied by the district court.

## II. DISCUSSION

### A. Rule 50 Motions

#### 1. Standard of Review

##### a. Motion for Judgment as a Matter of Law

Although the Supreme Court has expressly declined to establish a standard of review for FED. R. CIV. P. 50 motions, *see Dick v. New York Life Ins. Co.*, 359

U.S. 437, 445, 79 S.Ct. 921, 3 L.Ed.2d 935 (1959), this Circuit has held that a district court's application of Rule 50 will be subject to *de novo* review, *see K & T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 175 (6th Cir.1996). We should neither weigh the evidence nor question the credibility of witnesses nor substitute our judgment for that of the jury, but should view the evidence in the light most favorable to the nonmovant, granting that party the benefit of all reasonable inferences. *See id.* at 176. "Only when it is clear that reasonable people could come to but one conclusion from the evidence should a court grant a motion for [judgment as a matter of law]." *Wayne v. Village of Sebring*, 36 F.3d 517, 525 (6th Cir.1994).

### b. Motion for a New Trial

A district court's denial of a motion for a new trial is reviewed for an abuse of discretion, *see Logan v. Dayton Hudson Corp.*, 865 F.2d 789, 790 (6th Cir.1989), which requires "a definite and firm conviction that the trial court committed a clear error of judgment," *id.* (citing *Balani v. Immigration & Naturalization Serv.*, 669 F.2d 1157 (6th Cir.1982)). We have held that:

> [w]hen reviewing a motion for a new trial, a court should indulge all presumptions in favor of the validity of the jury's verdict. A court should refrain from interfering with a jury's verdict unless it is clear that the jury reached a seriously erroneous result. The simple fact that the grant of a new trial might result in a different outcome is not a valid basis for

disturbing a jury's verdict which is otherwise based upon legally sufficient evidence.

*Brooks v. Toyotomi Co., Ltd.*, 86 F.3d 582, 588 (6th Cir.1996) (internal citations omitted), *abrogation on other grounds recognized by United States v. Webb*, 157 F.3d 451, 452–53 (6th Cir.1998) (*per curiam*), *abrogated by Dillon v. United States*, 184 F.3d 556 (6th Cir.1999).

### 2. ADEA Claim

To prove age discrimination under the ADEA, 29 U.S.C. § 621 *et seq.*, an employee must show that age was the determining factor in the employer's decision—that is, that the adverse employment action would not have been taken but for the employer's motive to discriminate on the basis of age.[3] *See Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1023 (6th Cir.1993). Such a showing may be made by resort to direct evidence or circumstantial evidence. *See Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1081–84 (6th Cir.1994).

### a. Direct Evidence

Direct evidence may include an employer's age-related comments that refer directly to an employee. Such evidence may support an inference of age discrimination. *See McDonald v. Union Camp*, 898 F.2d 1155, 1162 (6th Cir.1990). However, "isolated and ambiguous comments are too abstract, in addition to being irrelevant and prejudicial, to support a finding of age discrimination." *Phelps*, 986 F.2d at 1025 (internal citation and quotation marks omitted). In making a determination

---

**3.** The analysis of an age discrimination claim brought under the Tennessee Human Rights Act is substantially similar to the analysis of such a claim brought under the Age Discrimination in Employment Act. *Compare Loeffler v. Kjellgren*, 884 S.W.2d 463, 469 (Tenn.Ct. App.1994) (noting use of *McDonnell Douglas* approach for analysis of age discrimination

claims under the THRA) *with Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1081 (6th Cir.1994) (noting use of *McDonnell Douglas* approach for analysis of age discrimination claims under the ADEA). Accordingly, we have not dealt separately with the THRA claim in this opinion.

whether an inference of age discrimination is warranted, we examine age-related statements, focusing on "whether the comments were made by a decision maker or by an agent within the scope of his employment; whether they were related to the decision-making process; whether they were more than merely vague, ambiguous, or isolated remarks; and whether they were proximate in time to the act of termination." *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1330 (6th Cir.1994).

Hudson alleged that prior to the time of his August 1995 performance evaluation, and continuing afterwards, both Woltz and Duensing referred to Hudson as "old man," "old bastard," and "wise old bird," and referred to Jim Herman, Hudson's replacement, as "Young Herman." On another occasion, Duensing is alleged to have said to Hudson, "What's the matter, are you old or do you have Alzheimer's?" In Hudson's 1995 performance evaluation, in response to the question, "Is he/she in good health?" Duensing wrote, "Yes, but getting old." In another portion of the evaluation, in response to the question, "What do you consider [the employee's] most notable weakness?" Duensing wrote, "Age." Finally, on March 24, 1997, Duensing allegedly said to Hudson, when explaining the reason that Insteel had decided to terminate him, "You don't have the vision to take us into the twenty-first century." Hudson believed this comment to be a direct reference to Hudson's age, particularly in light of the saying that "old men have dreams, young men have visions."

Defendants argue, and we agree, that the jury never heard evidence concerning when the alleged age-related comments were made (with the exception of the "vision" comment, which was made on the date of Hudson's termination, and the evaluation comments) and thus could not have reasonably found a causal link between the comments and Insteel's decision to discharge Hudson. *See Cooley*, 25 F.3d at 1330 (noting that proximity in time to the act of discharge is a relevant consideration in determining whether an inference of age discrimination is warranted). Neither did the jury have before it sufficient information to determine whether the comments were isolated or ambiguous. While it is true that based on this direct evidence alone, a jury could not have reasonably concluded that, but for his age, Hudson would not have been discharged, Hudson nevertheless successfully relied upon circumstantial evidence to state a submissible case.

### b. Circumstantial Evidence

A reviewing court "need not address the sufficiency of plaintiff's prima facie case, and may instead proceed directly to the ultimate question whether plaintiff has established discrimination." *Brownlow v. Edgecomb Metals Co.*, 867 F.2d 960, 963 (6th Cir.1989); *accord Suggs v. ServiceMaster Educ. Food Mgmt. .*, 72 F.3d 1228, 1232 (6th Cir.1996) (noting that when a case proceeds to trial on the merits, a reviewing court does not revisit whether the plaintiff established a prima facie case, but looks only to "the ultimate question of whether the plaintiff carried her burden of proof of discriminatory discharge"). Assuming, therefore, that Hudson established a prima facie case of discrimination and that Insteel put forward a legitimate, nondiscriminatory reason for its dismissal of Hudson, the primary question before us becomes whether Hudson at trial adequately proved that Defendants' justification was pretextual.

To establish pretext, a plaintiff must demonstrate by a preponderance of the evidence "(1) that the proffered reasons had no basis in fact, (2) that the proffered

reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate discharge." *Manzer*, 29 F.3d at 1084 (6th Cir.1994) (quoting *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 513 (7th Cir.1993)). Hudson relies upon the first approach, arguing that Defendants' assertions are factually false.[4] Despite Insteel's allegations that Hudson was a poor performer, the testimony of Insteel's own management employees draws into question whether Hudson was actually performing poorly, as Insteel argues. The jury had before it testimony that in December 1996, Hudson corrected a long-standing cleaning house problem at the Tennessee Wire Plant. Woltz and Duensing both admitted that Hudson had improved the situation at the Tennessee Wire Plant, and Duensing testified that in January and March 1997, he telephoned Hudson to congratulate him for the improvement in the Tennessee Wire Plant's performance. Finally, Hudson argues that, prior to discharging him, Insteel failed to follow its own corrective action policy by not providing Hudson with any "write ups" for unsatisfactory work or any "counseling sessions" to assist Hudson with improving his performance. The jury could have concluded that there were no write ups or counseling sessions because Hudson's work performance did not warrant any.

In addition to its challenge to the sufficiency of the evidence to support the jury's verdict, Insteel argues that it was unreasonable for the jury to disregard the so-called "same actor" inference, which "allows one to infer a lack of discrimination from the fact that the same individual both hired and fired the employee." *Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461, 463 (6th Cir.1995); *see also Proud v. Stone*, 945 F.2d 796 (4th Cir.1991) ("It hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job."). Defendants contend that Woltz hired Hudson, promoted him, and ultimately fired him, so the "same actor" inference, coupled with the lack of evidence in support of Hudson's claim of pretext, required the jury to find for Insteel on the discrimination claim. This argument is without merit: (1) the district court expressly instructed the jury that the "same actor" inference was "not mandatory," and Defendants did not at the time of trial, nor do they now, challenge the use by the district court of a permissive inference; and (2) because we necessarily cannot know what went into the jury's decision-making, we do not know whether the jury made the inference, but then found it trumped by the weight of Hudson's evidence on the question of pretext.

Viewing the evidence put forward by Hudson on the question of pretext in the light most favorable to Hudson, a jury could have reasonably concluded that that evidence, coupled with the evidence of age-related comments allegedly made by Insteel management employees, supported a

---

4. Defendants argue that their introduction of uncontroverted reports of key performance measurements for the Tennessee Wire Plant forces Hudson to rely on the second approach and produce additional evidence beyond that used to make his prima facie case of discrimination. The United States Supreme Court has noted that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000). In any event, as discussed *infra*, regardless of whether Hudson relies on the first or second approach, the record demonstrates that Hudson put forward sufficient evidence on the question of pretext to warrant sending the case to the jury.

finding that age was a determining factor in Insteel's termination of Hudson. Thus, the district court properly refused to grant Defendants' motion for judgment as a matter of law as to this claim.

### 3. Promissory Fraud Claim

■ Actions for promissory fraud, once disfavored under Tennessee Law, are now recognized in cases where a plaintiff can successfully demonstrate: (1) that the defendant made an intentional misrepresentation with respect to a material fact, *see Keith v. Murfreesboro Livestock Mkt., Inc.*, 780 S.W.2d 751 (Tenn.Ct.App.1989); (2) that the representation was made "knowingly" or "without belief in its truth," or "recklessly" without regard to its truth, *Tartera v. Palumbo*, 224 Tenn. 262, 453 S.W.2d 780, 782 (1970), *and* the misrepresentation "embod[ied] a promise of future action without the present intention to carry out the promise," *Keith*, 780 S.W.2d at 754; (3) that the plaintiff reasonably relied on the misrepresentation, *Holt v. American Progressive Life Ins. Co.*, 731 S.W.2d 923, 927 (Tenn.Ct.App. 1987); and (4) that the plaintiff suffered damage, *see id.*

#### a. Intentional Misrepresentation

■ Hudson argues that the jury had before it ample evidence to support its finding that Insteel committed promissory fraud. The jury heard testimony that Woltz, on behalf of Insteel, agreed to employ Hudson for a seven-year period and that Insteel agreed to the terms of a seven-year profit-sharing plan. Defendants contend that the jury, as evidenced by its refusal to find for Defendants on the breach of employment claim, apparently rejected Hudson's assertion that Defendants knowingly agreed to such a contract. In the absence of a "meeting of the minds" of the parties, Defendants argue, there

necessarily could not have been an intentional misrepresentation that would support a claim of promissory fraud. Hudson argued persuasively—and the district court, in denying Defendants' motion, agreed—that there is no inconsistency in the jury's finding for Hudson on the promissory fraud claim, yet not finding for him on his breach of contract claim. On the basis of the evidence before it, the jury could have reasonably concluded that Defendants misrepresented to Hudson their true intent concerning Hudson's employment and his participation in the SPSP.

#### b. Present Intent to Defraud

Intent to defraud is a question of fact. *See Keith*, 780 S.W.2d at 754. A plaintiff must put forward competent and material evidence of an intent to defraud to state successfully a claim for promissory fraud. *See Fowler v. Happy Goodman Family*, 575 S.W.2d 496, 499 (Tenn.1978). In no case may fraud ever be presumed or an inference of fraud made from "circumstances that equally permit reasonable inferences of non-fraudulent conduct." *American Cable Corp. v. ACI Mgmt., Inc.*, No. M1997–00280–COA–R3–CV, 2000 WL 1291265, *4 (Tenn.Ct.App.). A plaintiff must demonstrate that the statement of intention was false when made "by evidence other than subsequent failure to keep the promise or subjective surmise or impression of the promisee." *Farmers & Merchants Bank*, 664 S.W.2d at 80–81.

The jury heard Woltz's deposition testimony that he never intended to enter into an "employment contract" with Hudson. Hudson argues that this evidence, when considered in conjunction with the following, created a factual dispute that the jury could reasonably have resolved in favor of Hudson: (1) the testimony of Hudson and Wagner that Woltz did in fact agree to an employment contract for a term of seven

years; (2) Insteel's use of Woltz's father, an attorney, to draft the employment agreement instead of its outside law firm, which ordinarily provided Insteel's legal services; (3) Insteel's removal of the boilerplate language found in other Insteel documents explicitly stating Insteel's policy of not entering into employment contracts; (4) Woltz's statement to Hudson, "We [Insteel] will stand by our word"; (5) Woltz's statement to Hudson, "The deal [is] off if you consult an attorney"; and (6) Insteel's use in the SPSP of the phrases "[t]he term of this [profit-sharing] plan shall be for seven years" and "[t]he benefits ... under this Supplemental Profit Sharing Plan are one hundred percent (100%) vested."

Defendants, in opposition to Hudson's claims, make essentially two arguments: (1) a plaintiff cannot support a claim of promissory fraud by pointing to nothing more than the promisor's subsequent failure to keep that promise, *see Farmers & Merchants Bank*, 664 S.W.2d at 80; and (2) because the jury at trial found that no employment contract existed between the parties, then the employment relationship between Hudson and Insteel was necessarily one at will, which could be terminated by either party at any time, even assuming that one or both parties "promised" to create a relationship for a term of years. Defendants' first argument is merely a challenge to the sufficiency of the evidence underlying Hudson's promissory fraud claim, which we reject in light of the ample evidence proffered by Hudson on this question. Defendants' second argument is disposed of by *Lee v. Hippodrome Oldsmobile, Inc.*, No. 01A01–9705–CV–00202, 1997 WL 629951 (Tenn.Ct.App. Oct.14, 1997), which held that, Tennessee's employment-at-will doctrine notwithstanding, a promissory fraud claim may go forward, in the absence of an employment contract, where "an employer makes an offer of long-term, permanent employment with no present intention of keeping its promises." *Id.* at *2.

Hudson's promissory fraud claim turns on whether he adequately proved at trial that Insteel, at the time it entered into an employment relationship with Hudson, had no intent to perform its promises. In light of the abundant evidence on this point, a jury could have reasonably inferred that Insteel intended to defraud Hudson.

### c. Reasonable Reliance

Hudson argues that his reliance on the promises made by Defendants was reasonable in light of the confidentiality agreement signed by the parties in May 1993, whereby Defendants agreed not to reveal the contents of Hudson's PC Strand plan if the joint venture between the parties failed to materialize. Thus, Hudson suggests, he had nothing to lose by relying upon Defendants' representations. A jury could have found that Hudson's reliance on these alleged representations was warranted in light of: (1) the confidentiality agreement; (2) Woltz's statement "We will stand by our word"; and (3) Hudson's pre-employment dealings with Woltz.

### d. Damage

Hudson contends that he suffered damage at the hands of Defendants inasmuch as he presented and implemented the plan for construction of the PC Strand Plant and oversaw its production and development into a successful, profitable venture, yet failed to reap any attendant financial benefits. He points to the fact that he was discharged shortly after the plant began to generate substantial revenue and after he began to accrue substantial amounts of money under the SPSP. It is undisputed that if Hudson had continued his employment with Insteel, he would have been

entitled to additional profits under the SPSP, and thus, a jury could have reasonably concluded that Insteel's failure to maintain its employment relationship with Hudson caused him harm.

### e. Conclusion

In light of the foregoing, we find that judgment as a matter of law on this claim was inappropriate. The district court properly sent this issue to a jury. Accordingly, we AFFIRM the district court's denial of Defendants' Rule 50 motion.

### B. Rule 59 Motion

#### 1. Standard of Review

We review a trial court's denial of a motion to alter or amend the judgment, pursuant to FED. R. CIV. P. 59(e), for an abuse of discretion. *See Wilkins v. Baptist Healthcare Sys., Inc.,* 150 F.3d 609, 613 (6th Cir.1998).

#### 2. Analysis

At trial, the district court instructed the jury that if it found for Hudson on his ADEA claim, then it should award Hudson back pay in an amount "equal to the wages and benefits that he would have received from the defendants had he not been discharged from the time that he was discharged until the date of trial," deducting from this sum an amount equal to the total wages earned by plaintiff from other employment during this period. The district court also noted that Hudson was entitled to "other lost compensation," which included both the amount he would have received from the SPSP, and damages for any emotional or physical injuries suffered by Hudson. The jury awarded Hudson $57,575 in back pay, $150,000 in lost compensation under the SPSP, and no damages for emotional or physical injury. Defendants do not challenge this award. With respect to Hudson's promissory fraud claim, the district court instructed the jury that the amount of recovery for Hudson's promissory fraud claim was to be the benefit of the bargain between Hudson and Insteel, which constitutes "the amounts of compensation, benefits, and profit sharing that the plaintiff would have received if he had continued to work for Insteel until the date upon which the plaintiff's employment contract, if any, was due to expire." The jury awarded Hudson $301,500 in compensatory damages for his promissory fraud claim. Defendants challenge this award as duplicative and excessive.

 It is well-established that when a party is entitled to recovery of the same damages under separate causes of action, the trial court may allow recovery only once. *See General Tel. Co. v. EEOC,* 446 U.S. 318, 332, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980) ("[T]he courts can and should preclude double recovery by an individual."). It is undisputed that the damages award for Hudson's ADEA claim included damages for lost pay and lost SPSP earnings, both of which were also compensated by the jury's damages award for Hudson's promissory fraud claim. In fact, the district court specifically instructed the jury that any award for lost profits as compensation for age discrimination was to be calculated from the time that Hudson was terminated (March of 1997) until the date of trial (April of 1999), and any award for lost profits as compensation for promissory fraud was to be calculated for a period of seven years, from October 1, 1992, to September 30, 1999. At a minimum, it appears that Hudson might have received a double recovery for the period beginning March of 1997 and ending April of 1999 for lost pay and lost SPSP earnings, which were apparently compensated both in the jury's award for age discrimination *and* in its award for promissory fraud.

The jury's award, however, did not exceed that which could have reasonably been awarded in the absence of any double recovery. *See Farber v. Massillon Bd. of Educ.*, 917 F.2d 1391, 1395 (6th Cir.1990) (noting that a trial court may in its discretion remit a verdict when, after reviewing all evidence in the light most favorable to the awardee, it determines that the verdict is excessive or the result of passion, bias, or prejudice). The district court instructed the jury that Hudson was entitled to receive only the benefit of the bargain in damages for his promissory fraud claim. The jury found that the benefit of the bargain amounted to $301,500. That amount, coupled with the $207,575 ADEA award ($57,575 in lost pay and $150,000 in lost SPSP earnings), fell well short of the $690,000 that a jury could have reasonably awarded Hudson for lost SPSP earnings alone.[5] We are mindful of the difficult and necessarily speculative task that the jury had before it in determining future profits. Its verdict, however, did not exceed "the maximum damages that the jury reasonably could find to be compensatory for [Hudson's] loss." *Id.* at 1395. Accordingly, we do not find that the district court abused its discretion in denying Defendants' motion.

## III. CONCLUSION

Accordingly, we AFFIRM the district court's denial of Defendants' motion for judgment as a matter of law, or, in the alternative, a new trial as to Hudson's ADEA and THRA claims; we AFFIRM the district court's denial of Defendants' motion for judgment as a matter of law, or, in the alternative, a new trial as to Hudson's promissory fraud claim; and we AFFIRM the district court's denial of Defen-

dants' motion to amend the judgment, with respect to the jury's award.

---

5. The jury heard testimony from Hudson that Wagner had projected profits under the SPSP as high as $690,000.