RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0304p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

HANOVER AMERICAN INSURANCE COMPANY,

                           *Plaintiff-Appellee*,

     *v.*

TATTOOED MILLIONAIRE ENTERTAINMENT, LLC and CHRISTOPHER C. BROWN (19-5550 & 19-5551); JOHN FALLS (19-5483); DANIEL R. MOTT (19-5562),

                           *Defendants-Appellants*.

          Nos. 19-5483/5550/5551/5562

─────────────────

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 2:16-cv-02817—Jon Phipps McCalla, District Judge.

Argued: July 28, 2020[*]

Decided and Filed: September 11, 2020

Before: GUY, BOGGS, and WHITE, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Malcolm B. Futhey III, FUTHEY LAW FIRM PLC, Memphis, Tennessee, for Appellant in 19-5483. Jeremy T. Grabill, PHELPS DUNBAR LLP, New Orleans, Louisiana, for Appellee. **ON BRIEF:** Malcolm B. Futhey, III, FUTHEY LAW FIRM, Memphis, Tennessee, for Appellant in 19-5483. John W. Christopher, CHRISTOPHER LAW OFFICE, PLLC, Jackson, Mississippi, Charles Waldman, Memphis, Tennessee, for Appellants in 19-5550 and 19-5551. Jeremy T. Grabill, Mark C. Dodart, Pablo Gonzalez, Jeffrey A. Clayman, PHELPS DUNBAR LLP, New Orleans, Louisiana, John E. Anderson, Sr., DICKINSON WRIGHT PLLC, Nashville, Tennessee, for Appellee. Daniel R. Mott, Humboldt, Tennessee, pro se.

─────────────────

[*]The panel heard arguments only in case 19-5483, *Hanover Am. Ins. v. John Falls*. The other cases were submitted to the panel on the briefs.

---

**OPINION**

---

BOGGS, Circuit Judge.   The House of Blues music studio in Memphis suffered a burglary and arson in November 2015.   Chris Brown owned the House of Blues through Tattooed Millionaire Enterprises (TME).   He and two tenants, John Falls and Daniel Mott, submitted insurance claims for the loss.   But Brown submitted fraudulent documents in connection with this claim.   That led to an insurance-fraud lawsuit and, eventually, this trio of appeals.

Two of the appeals are straightforward to resolve.   Brown was found liable by a jury after admitting on the stand that he had forged documents submitted in his insurance claim.   He now makes three weak arguments about the judge's management of the trial and the admission of evidence.   Mott lodges a two-line pro se brief that raises no issues on which relief can be granted. In each of these cases, we affirm the court below.

Falls's case is different.   Falls prevailed before the jury, only to have the judge set aside the verdict and direct a judgment for the insurance company under Federal Rule of Civil Procedure 50(b).   Rule 50 is structured in two parts: (a) provides for the making of a motion for judgment as a matter of law at trial, and (b) provides for "Renewing the [50(a)] Motion after Trial."   But Hanover had failed to make a motion at trial for a directed verdict as to Falls under Federal Rule of Civil Procedure 50(a).   Somewhat surprisingly, we have not expressly decided whether a party can make a Rule 50(b) motion if it has not previously made a Rule 50(a) motion. For the reasons discussed below, we now hold that this is impermissible.   Therefore, Hanover forfeited its ability to "renew" a motion for a directed verdict after trial under Rule 50(b).   We thus reverse the district court and remand with orders to reinstate the jury verdict as to Falls.

**FACTUAL AND PROCEDURAL HISTORY**

In November 2014, Christopher C. Brown bought the historic House of Blues studio in Memphis through his newly formed production company, Tattooed Millionaire Entertainment,

LLC (TME). The House of Blues had been built for a band, the Bar-Kays, by the same architect who designed the Abbey Road studio of Beatles fame. Brown was a rock musician and music producer. Around the same time that he purchased the studio, Brown founded not only TME but also a new record label, Tattooed Millionaire Records (TMR).[1] After acquiring the studio building, Brown secured a policy in the name of TME with Hanover American that insured the studio premises for $4.65 million, Brown's Business Personal Property (BPP) (i.e., instruments and studio equipment[2]) for $5.5 million, and lost business income (BI) for $600,000.

House of Blues has three studios within the building: Studio A, Studio B, and Studio C. Brown operated Studio A himself, and leased Studio B to John Falls. Falls had spent 2000–2011 as the lead singer of Egypt Central, a successful rock band. During that period, Egypt Central had had five singles on Billboard Top 20 charts, averaged 250 shows per year, and licensed its music extensively to movies and video games. Falls estimated that the group's average yearly gross, as a band, was $3 million, with a peak year of $4 million. After 2011, Falls moved to Florida. In 2014, he returned to Memphis. Chris Brown had reached out to him about launching a record label (TMR) around a promising new band that Brown had found. Falls described his relationship with Brown prior to this point as "not buddies" and "cordial rivals." But in working together to produce the band's music, Falls and Brown felt they had struck up a "spectacular" working relationship.

Therefore, Falls bought into TMR (but not TME) for $1 million, to be financed through earnings over time. As a basis for his own music production career, meanwhile, Falls arranged to lease Studio B at House of Blues for $500/month and the equipment in it for $1,000/month for two years each, renewable indefinitely at Falls's option. Falls would later testify that he had asked Brown where the former had obtained his insurance, then gone to the same agent to acquire insurance for himself. The policy he obtained, also from Hanover, had a limit of

---

[1]In the recording industry, the production company creates the recorded product (whether it be a physical record or, these days, a digital record), while the record label distributes and markets that product. TME is a production company, while TMR is a record label. TME is wholly owned by (and, after the jury verdict, legally indistinguishable from) Chris Brown. John Falls had a one-third interest in TMR.

[2]Collectively referred to throughout the transcript as "gear."

$2.5 million for the gear in Brown's studio (BPP) and $500,000 for BI. During Brown's management of Studio B, nationally and locally prominent artists recorded there.

The policy also provided commercial general liability (CGL) coverage with a limit of $2,000,000. Falls was the sole named insured under the policy, but an endorsement provided that TME was an additional insured. That endorsement stated that it "modifies insurance provided under the following: COMMERCIAL GENERAL LIABILITY COVERAGE PART," and also stated that the endorsement amended "Section II – Who is an Insured" "to include as an additional insured [TME], but only with respect to liability for 'bodily injury', 'property damage' or 'personal and advertising injury' caused . . . by your acts or omissions or the actions or omissions of those acting on your behalf" "in the performance of your ongoing operations" or "in connection with your premises owned by or rented to you."

In a section entitled "Commercial Property Conditions," the policy provides:

This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

1. This Coverage Part;
2. The Covered Property;
3. Your interest in the Covered Property; or
4. A claim under this Coverage Part.

Brown leased House of Blues's Studio C to Daniel Mott. Mott had met Brown when Mott was a boy and Brown was a performing musician. By his own account, Mott was a "merch girl" [sic] (a low-level merchandise salesman) and lighting technician before Brown inexplicably set him up in Studio C as a producer. He would later admit on the stand to never having "earned a dollar producing music before 2015." Mott also obtained insurance from Hanover, for the same amount as Falls had.

On November 5, 2015, when Brown was out of town with his family on vacation in Arkansas, persons unknown broke into the studio, committed arson using gasoline, and vandalized and burgled it. This resulted in just over $2 million in damage to the building itself. When Hanover began investigating, it was under the impression that only a mild amount of theft

had accompanied the arson, but when the claims were filed, it became clear that the theft had greatly exceeded the arson. The combined BPP claims eventually reached $10.5 million. It is unclear whether the thefts occurred at the time of the fire and were initially underestimated or whether there was a significant second round of theft after the fire, during times when the building was imperfectly guarded.[3] Brown/TME, Mott, and Falls hired a public adjustor, Goodman-Gable-Gould, who compiled their claims into one document that was then submitted to Hanover. This document, later labeled Exhibit 32, contained lists of the gear in each studio claimed as either damaged or lost, as well as receipts for the original purchase of the gear, provided by Brown. Each defendant signed a (separate) sworn proof of loss. Each submitted claims up to the policy limits, and Hanover made an initial advance payment of $2.7 million in total: $2,208,898.49 to Brown/TME and $250,000 each to Mott and Falls.

When Hanover began to investigate the claims, however, it discovered that all of the receipts that Brown had submitted, and which formed part of the combined packet submitted on behalf of all three claims, were fake. Hanover also discovered that this was not the first time Brown had been the unfortunate victim of an arson leading to an insurance claim for lost musical equipment: in fact, in just the previous calendar year, he had suffered a remarkably similar loss to arson (which he had not had to report on his insurance application only because the policy for House of Blues was in the name of TME), and the latest loss was the third suspicious loss in four years. Hanover filed suit seeking recovery of the funds it had advanced and a declaratory judgment that it did not owe any of the three the balance of their claims. Brown, TME, Mott, and Falls counter-sued.

The dispute was tried in the Western District of Tennessee, in a diversity action under Tennessee law, over five days in November 2018. At trial, Brown, Mott, and Falls each testified, and each presented very different personae and stories to the jury. Brown unabashedly admitted on the stand that he had faked the receipts. The forgery was on a grand scale: Using a combination of internet "novelty" receipt generators and old-fashioned do-it-yourself forgery,

---

[3]Hanover suggested intermittently at trial that Brown had been running a scam from the beginning as regards the amount and value of equipment in the building. But the jury found all three defendants not liable for insurance fraud in their *applications* (as opposed to their claims). Therefore, we take as truthful the value of the inventory existing in House of Blues at the time the policies were written.

Brown faked invoices, credit card receipts, and bank statements, for six- and seven-figure expenditures. Brown suggested then and now that he did all this because, with his computer stolen, he was unable to produce the originals and had been told he would not receive insurance payments to which he felt otherwise entitled. But in Brown's account, he had originally purchased the equipment from a "Michael Sargenti" who delivered it in unmarked box trucks for lump sums of cash—i.e., the receipts were not just recreations of lost originals, but forged representations of transactions that had never occurred. Moreover, the amount Brown supposedly paid Sargenti was far less than the amount he claimed on the receipts.

While Brown at trial seemed an accomplished musician and knowledgeable about running a studio, he also came across as deeply untrustworthy even beyond the admitted forgery. The judge in one instance caught him lying on the stand, and testimony from another witness exposed a series of lies related to rental of a replacement studio. He also admitted to using the insurance proceeds to partially pay for a $1.2 million dollar home and to fund his band's tour and recordings.

Mott tied himself closely to Brown, agreeing they were "close friends" and that he was "part of Mr. Brown's inner circle." He said that he had seen one of the forged receipts and had helped offload some of the gear from mysterious box trucks. At the same time, he provided no satisfactory answer as to why Brown had suddenly promoted him to run a studio. He was caught in at least a misstatement on the stand. He admitted to having not spent certain sums he had submitted under the "extra expenses" provision of the insurance claim, said that forging receipts would be justifiable if it was the only way to substantiate an insurance claim, and stated that he had given a hundred thousand dollars of his advance from Hanover to Brown.

Falls came across quite differently. For one thing, he exhibited a professional background and detailed grasp of the production business that indicated both that there were legitimate reasons for him to have control of Studio B and that he had in fact been hard and productively at work there until the fire. He also distanced himself significantly from Brown, testifying that he was not "close friends" or "part of [Brown's] inner circle." Like the other two defendants, he lacked documentation to back many of his transactions, but unlike them he was

convincing and detailed in describing the running of his cash-based business. In short, he presented himself as far more credible as a professional than Mott, and far more credible as a witness than Brown. Falls's testimony was also in part corroborated by the testimony of Ronnie Joe Bean, an independent appraiser from Nashville who had assisted in preparing valuations for the insurance claim. Bean also testified generally to the high professional quality of the studio, which he had visited before the fire.

Falls told the jury that he had reviewed the parts of the claim that had been submitted that pertained to him, and that they were an accurate representation of the equipment lost and damaged from Studio B. On the other hand, he stated that he had not been involved in the initial purchase of the gear in that studio, nor had he reviewed the receipts nor known of Brown's forgeries until Hanover filed suit. Falls's counsel elicited testimony from Brown that Brown had never told Falls about forging the receipts, and that Falls had no reason to suspect they were forged. Falls's counsel also elicited from Brown an extensive description of the gear in Falls's Studio B, corroborated in part by photographs and other witnesses.

When the case was submitted to the jury, the verdict form had 19 questions divided into three categories: claims between Hanover and TME or Brown, claims between Hanover and Mott, and claims between Hanover and Falls. The jury found that Brown and TME were indistinguishable and that liability for the LLC's actions could be imposed on Brown personally. It found that Brown and Mott had each "ma[d]e a material misrepresentation of the loss to Hanover American Insurance Company with intent to deceive" and had "committed an unlawful insurance act . . . in making a claim for payment . . . ."[4] It found Brown/TME liable to Hanover for $2,208,898.49, and Mott liable for $250,000—i.e., the return of all money advanced to each. Naturally, the jury then found Hanover not liable to Brown/TME or Mott for breach of insurance contract.

As to Falls, the result was different. The jury found Falls not liable for material misrepresentation with intent to deceive on the loss claim and not liable for unlawful insurance

---

[4]The jury found all three defendants not liable for fraud as to the *application* for insurance, meaning that Brown/TME's and Mott's fraud and unlawful act pertained to the insurance claim filed after the fire.

acts. Instead, it found that Hanover had materially breached its contract with Falls, who was entitled to recover $2,500,000 in Business Personal Property insurance and $250,000 in Business Income insurance. These figures represented the limits of his policies, when taking into account the $250,000 already advanced to Falls for BI insurance.

Following the jury verdict, Hanover filed a motion under Federal Rule of Civil Procedure 50(b) for "Renewed Judgment as a Matter of Law . . . as to John Falls." Hanover argued in part that the verdict should be overturned because TME was an additional insured under Falls's CGL coverage, and that Brown/TME's fraud voided Falls's property coverage given the language in the fraud provision stating that property coverage is voided if "you or any other insured" conceals or misrepresents a material fact in pursuing a property claim. Falls argued in response that Hanover had forfeited the argument by failing to make a Rule 50(a) motion as to Falls, and that TME's status as an additional insured applies only to the CGL coverage and therefore does not apply to the property-coverage provisions. The district court noted the forfeiture argument but did not address it specifically, held that Brown/TME's fraud voided Falls's property coverage under the plain language of the fraud provision, and granted Hanover's motion.[5] Due to this ruling, Falls took nothing and instead owes Hanover $250,000 in repayment for the advance he received prior to trial.

Brown/TME, Mott, and Falls all appeal separately, as cases No. 19-5550/-5551, 19-5562, and 19-5483, respectively. Hanover moved to dismiss the appeal for lack of appellate jurisdiction. A screening panel, however, found that, in light of the voluminous record, it was

---

[5]In this motion, Hanover also moved in the alternative for a new trial under Fed. R. Civ. P. 59(a). The district court took note of this argument but ruled only on the Rule 50(b) motion on the merits. Hanover mentions the Rule 59 argument before us once, in two sentences of a footnote, citing authority showing that we *might* be able to reach this issue, notwithstanding the lack of a ruling from the court below. *Szekeres v. CSX Transp., Inc.*, 731 F.3d 592, 604 (6th Cir. 2013) ("This court . . . can rule on a Rule 59(a) motion for a new trial if a district court fails to consider such a motion after ruling on a motion for judgment as a matter of law.") It is questionable, though, whether the court actually failed to consider it: because the district court analyzed the issue, though it did not rule on it, the better interpretation is that it implicitly denied the Rule 59 motion. *See Kusens v. Pascal Co.*, 448 F.3d 349, 360 (6th Cir. 2006).

Either way, while Hanover perhaps shows that we *can* reach the issue, it makes no argument at all as to whether or why we *should*. It advances no argument based on the standards for granting a new trial. Therefore, Hanover has forfeited its Rule 59 argument. *See United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006) (party deemed to have waived issue where it only makes a "perfunctory mention" of it in a footnote of its brief).

more appropriate to reserve this question for the merits panel. It therefore denied the motion "without prejudice to raising the jurisdictional issue" before us. Hanover continues to do so.

## ANALYSIS

### I. Jurisdiction

Hanover claims that we lack appellate jurisdiction because the judgment below is not final. *See* 28 U.S.C. § 1291. Before trial, the court below granted Hanover's "Motion to Bifurcate Trial of Attorney's Fees, Costs, and Claim-Related Expenses." The second, bifurcated part of the trial on these issues remains pending. Therefore, Hanover argues, the judgment below is not final, and we lack jurisdiction to hear this appeal.

It is well established that an appeal can be taken (indeed, *must* be taken, within the relevant time limit) from a judgment treated as final, even though an application for attorney's fees and other costs is still pending. *Ray Haluch Gravel Co. v. Cent. Pension Fund of Int'l Union of Operating Eng'rs & Participating Emp'rs*, 571 U.S. 177, 179, 188–89 (2014); *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 202–03 (1988). Hanover, however, argues that this case is different, because:

> [I]n phase two of the trial, Hanover will not seek attorney's fees alone, but also compensatory damages recoverable under Tennessee substantive law for various amounts incurred in response to the fraudulent insurance claims, including claims handling and investigation expenses, consultant fees, travel costs, and other incidental claim expenses . . . .

Therefore, Hanover argues, this matter is different than *Haluch* or *Budinich*, because "the issues remaining to be tried in this case go far beyond a ministerial calculation of attorney's fees."

This is unconvincing. *Haluch* makes it clear that "fees and *costs*" are generally treated "as collateral for finality purposes." 571 U.S. at 187 (emphasis added). Such expenses are exactly what Hanover now seeks. Indeed, in its Motion to Bifurcate, Hanover characterized what it sought in the second trial as "all *attorney's fees and costs*, including claim expenses, incurred by Hanover during its investigation of Defendants claims and the prosecution of this action." This makes it clear that the "category of claim expenses" was "include[d]" within the

category of "attorney's fees and costs"—exactly what *Haluch* and *Budinich* say are collateral for finality purposes.

Nor does it matter that the recovery of such costs is authorized by statute. *Haluch* in general stands for the proposition that it does not matter whether the source of a claimed right to attorney's fees and costs in a particular case arises from contract, statute, or case law, nor whether such expenses were incurred prior to the start of litigation, but that in all such cases the rule from *Budinich* applied. *See* 571 U.S. 188–89. Moreover, *Haluch* explicitly notes that "[m]any fee-shifting statutes authorize courts to award additional litigation expenses, such as expert fees" and that "where, as here, those types of fees are claimed and awarded incidental to attorney's fees . . . *Budinich* remains applicable." *Ibid.*

The reasoning behind the *Haluch* and *Budinich* decisions confirms that those cases apply here. Notably, the *Budinich* Court reasoned that, "[a] question remaining to be decided after an order ending litigation on the merits does not prevent finality if its resolution will not alter the order or moot or revise decisions embodied in the order." 486 U.S. at 199. No finding as to fees and costs will alter the questions now on appeal. And it is plain from a reading of Hanover's Motion to Bifurcate that the second trial is designed to assess collateral matters that would arise—if at all—downstream from certain outcomes in the first trial. Hanover was right then, and it is wrong now. We hold that we have jurisdiction to hear this appeal.

## II.  Issues Presented by Brown

*Standard of Review*: The trial court's evidentiary rulings are reviewed for an abuse of discretion. *See United States v. Seago*, 930 F.2d 482, 494 (6th Cir. 1991). When there is no contemporaneous objection, we review the trial judge's conduct during trial for plain error. *United States v. Hynes*, 467 F.3d 951, 957–58 (6th Cir. 2006).

### A.  Denied Re-Cross

Brown first argues that the district court abused its discretion by refusing to allow him to introduce an exhibit that, in three different variations, he tried to introduce several times. Brown faced the problem that his forging of the receipts had thrown into doubt the validity of the

inventory of Business Personal Property (i.e., studio gear) that he had sent to Hanover. His attorneys therefore hit upon the idea of using a combination of photographs and video stills that they had introduced showing the pre-fire state of the studio, testimony from Brown, and testimony from appraiser Ronnie Joe Bean, to recreate the list. While the idea might have had some merit—the judge eventually concluded that, had he been properly asked, he would have admitted Bean as an expert and that the methodology of the proposed list might have been sound—it ran into several problems.

First and foremost was timing. Brown's attorney first sought to introduce the exhibit on re-cross (really a re-direct) of Brown.[6] The judge correctly ruled that the document, being part of Brown's case-in-chief, should have come in on direct and that it was now outside the scope of the "re-cross" under Federal Rule of Evidence 611. Brown tried to introduce the document repeatedly on the following day of trial, during Bean's testimony. Here, deeper problems emerged. As the district court explained, any such list would be a summary, under Federal Rule of Evidence 1006, of materials too voluminous to be introduced into court. But that Rule requires that the "proponent must make the originals or duplicates available for examination . . . by other parties . . . ." Fed. R. Evid. 1006. In the court's view, Brown could not satisfy that requirement, because the original list that had been submitted to the insurance company was tainted all the way through by Brown's fraud.[7] *See* Fed. R. Evid. 403.

Brown might have been able to recreate (or re-substantiate) the list by identifying pieces of equipment from photographs of the studio that were available, but Brown had not been asked to do so when he first testified. Not all the photographs that Brown wished to rely on had been introduced into evidence. Finally, in order to testify to values in this way, Bean would have to be declared an expert witness, which under Federal Rule of Civil Procedure 26 meant he would

---

[6]Due to the cross-suits, each party was required to defend and prosecute at once. Hanover, moreover, called Brown adversely as part of its case-in-chief, though his testimony was also part of his own case-in-chief. His testimony was therefore given (as was that of the three other defendants) in the following format: direct examination by Hanover's attorney (who was permitted to examine as if on cross), followed by "cross-examination" by Brown's own attorney, then questioning from the other defendants' attorneys, then "re-direct" from Hanover, and finally re-cross by Brown's attorney. It was not until this very last examination that Brown's lawyer sought to introduce the document.

[7]We note, however, that no limiting instruction was given when this document was admitted.

have had to submit a report prior to testimony. So, the judge summed up, the proposed exhibit now had problems under Federal Rule of Civil Procedure 26 and under Federal Rules of Evidence 403 and 1006. As the district court observed, Brown's lawyer was trying to "build the ship as we sail," and it was too late.

In the midst of trying to address these issues—and realizing at least some of his mistakes—counsel sought to reopen Brown's testimony after he was done with Bean. The district court denied this, ruling that nothing had precluded Brown from properly putting on this evidence the first time around.

It is not entirely clear which of these decisions Brown now appeals. His brief complains primarily of the judge's refusal to allow Brown's counsel to re-cross Brown, not the refusal to admit the documents per se. Brown also briefly addresses the judge's refusing to allow Brown's testimony to be reopened, but he does not make arguments regarding the Bean testimony or the evidentiary rulings as to the proposed exhibits themselves. In any event, none of these decisions can be said to be an abuse of discretion. Hanover points to the case of *Wyatt v. United States Fidelity & Guarantee Co.*, 59 F.3d 172 (6th Cir. 1995) (table), in which we upheld, as not an abuse of discretion, a trial judge's refusal to allow a litigant to introduce an affidavit in redirect examination as outside the scope of the previous examination. That citation is well taken. But more than that, the multiple evidentiary problems with Brown's proposed course of action, at the time he proposed it, make it clear that the trial judge was well within his discretion in ruling as he did.

## B. Time Limits

Brown also argues that the trial court committed plain error by imposing a time limit on Brown and not (according to him) placing one on Hanover. He makes this argument conclusorily, in two paragraphs without a meaningful citation. Even before reaching the law on this argument, the argument is not supported by the facts. The trial judge imposed a two-hour time limit on *each* side for questioning Brown as a witness. Our review of the record, moreover, shows that the district court was acting sensibly to try to rein in and channel lawyers on both

sides who were being argumentative, circuitous, or did not have a firm grasp on their case, the Rules of Evidence, and the Rules of Procedure.  (*See infra* Section II.C.)

"[A] district court has broad discretion to place limits on the presentation of evidence to prevent delay, waste of time, and needless presentation of cumulative material."  *Trepel v. Roadway Express, Inc.*, 40 F. App'x 104, 108 (6th Cir. 2002).  The district court operated well within that broad discretion in this case.

## C.  Judicial Interference

Brown's third argument is that the district court denied him a fair trial by intervening excessively to question witnesses himself, thus impermissibly interfering with Brown's ability to put on a case.  This claim also has no merit.

Brown relies on *United States v. Hickman*, 592 F.2d 931, 933 (6th Cir. 1979), in which we disapproved of extensive judicial intrusion into the case via the questioning of witnesses.  But in *Hickman*, the judge interrupted the defense counsel more than 250 times over the course of a one-day trial.  *Id.* at 932.  A review of the record in the case before us reveals nothing even close to that.  Indeed, Brown cites not one specific instance in his brief, much less 250.  To be sure, the judge interrupted Brown a few times.  (Hanover estimates five or six.)  But the character of these interruptions is far from the prejudicial interference that *Hickman* was worried about.  The court's interruptions in this case were designed to get to the point or help Brown's counsel in his attempt to introduce evidence—interventions that must be classified as either neutral or helpful, and are consonant with the proper role of the trial judge.  Nor were such interruptions unique to Brown's counsel.  In general, the judge had to intervene with several of the lawyers so that they would develop evidence in ways that were consistent with the Rules and common practice, or occasionally to question witnesses himself.  There was no abuse of the trial judge's role here, much less plain error.

Brown has raised three issues to no avail.  We AFFIRM the decision of the district court in Brown's case, No. 19-5550/-5551.

### III. Mott Presents No Issues

The entire substance of Mott's handwritten, pro-se appeal is two sentences: "The judge and my lawyer failed in providing me with a fair trial. No evidence was presented in my portion of the trial to keep Hanover from denying my claim." He requests retrial. Mott then uses his reply brief to say that he joins Brown's pleadings. Unfortunately for him, however, Brown does not make arguments specific to Mott's case, and, as we have just seen, his arguments as to the conduct of the trial as a whole have no merit.

"A party may not raise an issue on appeal by mentioning it in the most skeletal way, leaving the court to put flesh on its bones." *Laster v. City of Kalamazoo*, 699 F. App'x 547, 548 (6th Cir. 2017) (quoting *United States v. Hendrickson*, 822 F.3d 812, 829 n.10 (6th Cir. 2016)). Even under the generous standard of interpretation that we afford to pro se litigants, Mott has not made out enough of a case to avoid forfeiture. Moreover, insofar as Mott alleges a sufficiency-of-the-evidence argument ("No evidence was presented . . . to keep Hanover from denying my claim"), it is forfeited for a second reason. If a party fails to make a renewed motion for judgment as a matter of law after a jury verdict, "an appellate court is 'powerless' to review the sufficiency of the evidence after trial." *Ortiz v. Jordan*, 562 U.S. 180, 189 (2011) (quoting *Unitherm Food Systems, Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 405 (2006)). The record does not show that Mott made any such motion. Therefore, his argument is forfeited twice over. We AFFIRM the district court's judgment as to Mott, on appeal No. 19-5562.

### IV. Issues Presented by Falls

*Standard of Review*: The term "motion for judgment as a matter of law" under Federal Rule of Civil Procedure 50 amalgamates the old terms "directed verdict" and "verdict JNOV." *K & T Enterprises, Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 175 (6th Cir. 1996). We review a district court's application of Rule 50 *de novo*. *Ibid.* There is a distinction in the case law between review of factual questions in Rule 50 motions in diversity cases and in federal-question cases: "Legal determinations, whether made in a diversity case or in a federal question case, will always be reviewed *de novo*" but in diversity cases, "[q]uestions of evidence sufficiency will be reviewed as the forum state would review them . . . ." *Id.* at 176. The case before us arises out

of diversity jurisdiction and concerns the application of Tennessee law. This distinction does not matter, however, for two reasons. First, Hanover *claims* that its argument is purely legal. As we shall see, there are reasons to doubt this, but insofar as it is true the *de novo* standard applies. Second, the standard of review under Tennessee law for factual determinations is *de novo* anyway, because "a [Tennessee] motion for judgment notwithstanding the verdict is the state-law equivalent of a federal motion for judgment as a matter of law." *Medlin v. Clyde Sparks Wrecker Svc.*, 59 F. App'x 770, 774 (6th Cir. 2003). So review is *de novo* either way.

As to factual questions, Tennessee law tells us that we must "review the record, discard all countervailing evidence, take the strongest legitimate view of the evidence in favor of the non-moving party, and allow all reasonable inferences in his favor." *Ibid*. The federal standard for assessing questions of law is the same: "[T]he evidence should be viewed in the light most favorable to the party against whom the motion is made, and that party given the benefit of all reasonable inferences. The motion should be granted . . . only if reasonable minds could not come to a conclusion other than one favoring the movant." *K & T*, 97 F.3d at 176.

## A. Hanover Forfeited its Rule 50(b) Motion

We cannot reach the merits of the district court's Rule 50(b) ruling without first contending with Falls's argument that Hanover forfeited its ability to make that motion by failing to make a Rule 50(a) motion at trial. Hanover argues that it did make such a motion, and thus did not forfeit its Rule 50(b) motion—and that in any event, if it did fail to make a Rule 50(a) motion, there are policy reasons why that failure should be excused. While Hanover's contentions are not without some merit, Falls has the better of each argument.

Rule 50(a) provides for motions for judgment as a matter of law during trial:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may . . . grant a motion for judgment as a matter of law against [that] party . . . .

Fed. R. Civ. P. 50(a). Subsection 50(a)(2) likewise specifies that the correct time for making a 50(a) motion is before the case is submitted to a jury: "A motion for judgment as a matter of law

may be made at any time *before the case is submitted to the jury*." (emphasis added). Rule 50(b) then provides for "*Renewing* the Motion after Trial." Fed. R. Civ. P. 50(b) (emphasis added). The wording of Rule 50(b) shows that it is conditional on a Rule 50(a) motion having been made at trial:

> If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment . . . the movant may file a *renewed* motion for judgment as a matter of law

Fed. R. Civ. P. 50(b) (emphasis added). The 1963 Advisory Committee Note to Rule 50(b) makes explicit what is implicit (but plain) in the language of the rule: "A motion for judgment notwithstanding the verdict will not lie unless it was preceded by a motion for a directed verdict made at the close of all the evidence."

Our circuit has never ruled directly on the question of whether a 50(a) motion is required to make a Rule 50(b) motion. Nevertheless, our case law unmistakably carries that implication. "A Rule 50(b) motion 'is only a renewal of the preverdict motion,' and 'it can be granted only on grounds advanced in the preverdict motion.'" *Kay v. United of Omaha Life Ins. Co.*, 709 F. App'x 320, 328 (6th Cir. 2017) (quoting *Ford v. Cnty. of Grand Traverse*, 535 F.3d 483, 491 (6th Cir. 2008) (quoting Fed. R. Civ. P. 50(b) advisory committee's note to 2006 amendment)). *Kay* specifies that "this requirement protects 'the plaintiff's Seventh Amendment right to a jury trial' by 'requiring that parties raise important issues *before* the case is submitted to the jury.'" *Id.* at 328 (quoting *Ford*, 535 F.3d at 492 (quoting *Am. & Foreign Ins. Co. v. Bolt*, 106 F.3d 155, 160 (6th Cir. 1997))). And because *Kay* says that, to maintain a Rule 50(b) motion, "the Rule 50(a) motion must have 'provid[ed] notice to the court and opposing counsel of any deficiencies in the opposing party's case'" before the case went to the jury, *id.* at 328 (quoting *Ford*, 535 F.3d at 492 (quoting *Kusens v. Pascal Co.*, 448 F.3d 349, 361 (6th Cir. 2006))), then *a fortiori*, the Rule 50(a) motion "must" have existed, full stop. *See also Sykes v. Anderson*, 625 F.3d 294, 304 (6th Cir. 2010) ("The Defendants' failure to make a pre-verdict motion for judgment as a matter of law under Rule 50(a) on the grounds of qualified immunity precluded them from making a post-verdict motion under Rule 50(b) on that ground.").

This is also the consensus of our sister circuits.  *See* 9B CHARLES ALAN WRIGHT & ARTHUR MILLER, FEDERAL PRACTICE & PROCEDURE § 2537 (3d ed.) ("Because a Rule 50(b) motion is a renewal of an earlier motion, the failure to make a Rule 50(a) motion usually prohibits the consideration of a Rule 50(b) motion, although some courts have acknowledged exceptions."  (collecting sources)).[8]  *See, e.g.*, *Williams v. Gaye*, 895 F.3d 1106, 1131 (9th Cir. 2018); *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1083 (9th Cir. 2009) ("Failing to make a Rule 50(a) motion before the case is submitted to the jury forecloses the possibility of considering a Rule 50(b) motion.").

Thus, unless Hanover can either show that it did in fact make a Rule 50(a) motion or show that an exception should apply, it will be held to have forfeited its Rule 50(b) motion and its ability to defend the results of that motion on appeal.  To those arguments we now turn.

### i.  Hanover's Argument That It Did Make a Rule 50(a) Motion

Hanover argues that it did make a Rule 50(a) motion, because "[b]efore the case was submitted to the jury, all parties agreed on the record, with the district court's blessing, to reserve and preserve all Rule 50 motions."  This amounts to an argument that either a Rule 50(a) motion *was* made or an argument that the district court deemed such a motion to have been made and that we ought to hold such a ruling to be sufficient to satisfy the strictures of Rule 50.  We begin by looking at the record.

The making of Rule 50(a) motions came up three times at trial.  First, while Hanover was still putting on its case-in-chief as plaintiff, the court discussed the proposed jury verdict form with the lawyers for all sides.  In the course of doing so, the court stated that:

> Now, everybody needs to remember.  When we – when you rest, we can reflect at
> that time that everybody's made the motion they need to preserve everything.
> More than likely based on this case, I think everybody will understand it's going

---

[8]The exceptions catalogued in Wright & Miller are for technical or *de minimis* errors, manifest injustice, and jurisdictional issues.  These address concerns that we handle in our circuit through other doctrinal means.  Rather than saying that a Rule 50(b) motion that departs in a *de minimis* fashion from a litigant's Rule 50(a) motion does not have a predicate Rule 50(a) motion, but that that failure is excused, for instance, we have instead a rule of liberal construction for assessing the degree of fit required between the two motions.  *Cf. Kusens*, 448 F.3d at 361.  Jurisdictional issues can of course be raised at any time.  *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434–35 (2011).

to be denied.  No point in wasting a lot of time.  I know you need to make the motions.  We'll do that in a – I don't want you to spend a lot of time on it.  I would probably, even if I thought it was a particularly serious issue, I would probably take it under advisement, because you don't want to do that off the cuff necessarily in a case like this.  You want to be really careful.  We always want to be careful anyway.

The trial court thus sent conflicting signals, a pattern that would continue.  On the one hand, the court indicated that it would make the record "reflect" that "everybody's made the motion they need to preserve everything" (perhaps meaning the Rule 50(a) motions).  This could be read to suggest that the motions need not perhaps even *be* made, but rather that the motion would simply be taken as a given.  And the court added that, "I don't want you to spend a lot of time on it."  On the other hand, however, the court noted (correctly), that "I know you *need* to make the motions."  (Emphasis added.)  The court added, in a comment that may have been directed either to counsel or to itself, that "you don't want to do that off the cuff . . . [and] [y]ou want to be really careful."  Above all, the court had specified that the Rule 50(a) motions would be made "when you rest."

When Hanover rested, the court noted that, "we've agreed how we would handle this in terms of reflecting any motions that would be required to be made.  So, we should be ready for our next witness."   (I.e., for the defendants/counter-plaintiffs to begin their case-in-chief.)  Brown's attorney requested a sidebar, at which point the court stated that:

> THE COURT:  . . . . We agreed we would reflect at this time that the motions were made and that the plaintiff would not raise an objection regarding their failing to raise – to make the motions at this time.
>
> MR. DODART [Hanover's counsel]:  Correct.
>
> THE COURT:  Now at the end of the case we may need a little more thorough presentation.  Is that okay?
>
> MR. DODART:  That's okay, as long as I'm not waiving my motions at the end of my case.
>
> THE COURT:  You're not.
>
> MR. DODART:  Okay.
>
> THE COURT:  So everybody agrees that there will be enough facts that have come in that we would understand that the Court would have to deny motions for

the directed verdict for everybody. Interesting question on some of it but I do think we would have to do that. So, we're going to reflect that the motions are taken under advisement. That's what we said. We wouldn't actually deny them. We would take them under advisement. That takes care of that.

Again, there are mixed signals. On the one hand, the court states: "We agreed we would reflect at this time that the motions were made" at this point, and the court appears to rule that they were "taken under advisement." On the other hand, no motion actually was made—so there was nothing yet for the court to take under advisement. A Rule 50(a) motion requires a motion that "*specif*[*ies*] the judgment sought and the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2) (emphasis added). Here we have no specificity at all: the parties never said anything. Moreover, it is unclear if the court's statements here even apply to Hanover's Rule 50(a) motion. Since it is Hanover who just rested, and since the court speaks of an agreement that "the plaintiff [i.e., Hanover] would not raise an objection regarding their [defendants'] failing to . . . make the motions at this time," even if Rule 50 motions were being (deemed) made or ruled on at this time, they would be the *defendants'* motions, not Hanover's.

In light of the court's comment that, "at the end of the case we may need a little more thorough presentation," it seems most sensible simply to interpret the judge as putting off the matter until all parties had concluded their cases. This would be consonant both with Rule 50(a)(2)'s provision that a Rule 50(a) motion may be made "at any time before the case is submitted to the jury" and also with the complications of a case involving countersuits where each side had been using the other sides' witnesses as part of its own presentation.

The third and final discussion of Rule 50(a) motions during trial came, naturally enough, after the conclusion of all the evidence. At that time, the court appeared ready to submit the case to the jury, when Brown's attorney said: "I'm just, again, wondering when are we going to make the directed verdict, just to keep the record[.]" The court responded, "Oh, yes, and we said we were reflecting that those were being made; but you're entitled to do that if you want." This again suggests that the court thought that it could simply deem Rule 50(a) motions to have been made. Nevertheless, the court continued, "Do you want to make a more formal statement at this time?" Brown's attorney thereupon did make a Rule 50(a) motion (not at issue in this appeal) on the record, "specify[ing] the judgment sought and the law and facts that entitle the movant to the

judgment," as required by the Rule. Fed. R. Civ. P. 50(a)(2). Then, when Brown's attorney was done, Hanover's attorney said, "I would like to move for a judgment as a matter of law when the Court's ready for me." Hanover thereupon made a proper Rule 50(a) motion as to Tattooed Millionaire and Brown, *but not as to Falls*. Hanover pointed to specific facts from the trial and to the Tennessee insurance statute which it claimed *Brown* had violated and then moved for judgment as a matter of law. The court took that motion under advisement. Hanover said nothing as to Falls or Mott.

When, after trial, Hanover made its Renewed Motion for Judgment as a Matter of Law as to Falls, Falls argued that the motion should be denied, because Hanover had never made an initial Rule 50(a) motion in this regard and so had forfeited its right to make a Rule 50(b) motion. In ruling on the motion, the court acknowledged that "Hanover did not make any motions for JMOLs specific to John Falls," but stated further that Hanover "claims it did not waive its Rule 50(b) Motion because 'all parties agreed on the record to reserve and preserve all Rule 50 motions consistent with pre-trial motions and the trial evidence.'" The court then moved on to the merits (and granted Hanover's motion). That is to say, while it *sub silentio* seems to have held that Hanover was entitled to make a Rule 50(b) motion, the court below never explicitly held that Hanover had made a 50(a) motion. Nor did the court provide a reason Hanover could escape the requirement to have done so. Yet it ruled in Hanover's favor anyway.

The first two exchanges recorded above are insufficient to persuade us that the district court meant at that time to allow Rule 50(a) motions not to be made at all. The exchanges in question occurred in the middle of the trial and can be read as agreeing to postpone the making of such motions until just before the case was sent to the jury. The third colloquy is a closer call, because, even as the case was about to be submitted to the jury, the court remarked that "we were reflecting that those [Rule 50(a) motions] were being made." Though still not entirely clear, in context this is a stronger indication that the district court understood itself to be deeming (or to have already deemed) the motions to have been made, though they in fact had not yet been. The district court's post-verdict grant of Hanover's 50(b) motion is most easily reconcilable with this understanding.

But it is far less clear that Falls agreed to this—specifically, to the part where those motions would be preserved beyond the close of evidence and the jury's verdict, despite never having actually

been made, to be resurrected later.  Even more significantly, *Hanover* seems not to have shared the court's understanding at the time that the motions had already been deemed to be submitted.  If so, why did it make a detailed Rule 50(a) motion as to TME and Brown?  Its failure to do so as to Falls, when it did so as to other defendants, may have been a mistake or an oversight, but the fact remains: it made a motion as to other defendants, but not as to Falls.  On a plain reading of the record, Falls is right:  Hanover never made a specific Rule 50(a) motion as to him.

More importantly still, even if the district court believed it had the authority to deem Rule 50(a) motions made as if on the record, such an assumption was erroneous.  *See Karam v. Sagemark Consulting, Inc.*, 383 F.3d 421, 426 (6th Cir. 2004) ("[T]he proper practice is to allow the moving party to make its Rule 50(a) motion before the jury retires to deliberate." (citing Fed. R. Civ. P. 50(a)(2) advisory committee's note to 1991 amendment)).  As we have seen, the strictures of Rule 50(a) require that "[t]he motion *must* specify the judgment sought and the law and facts that entitle the movant to the judgment."  Fed. R. Civ. P. 50(a)(2) (emphasis added).  The requirement for specificity is grounded in reasoning related to the Seventh Amendment jury right (as well as basic fairness).  As the Note to the 2006 Amendment to Federal Rule of Civil Procedure 50(b) explains:

> The earlier motion [i.e., the 50(a) motion] informs the opposing party of the challenge to the sufficiency of the evidence and affords a clear opportunity to provide additional evidence that may be available.  The earlier motion also alerts the court to the opportunity to simplify the trial by resolving some issues, or even all issues, without submission to the jury.  This fulfillment of the functional needs that underlie present Rule 50(b) also satisfies the Seventh Amendment. Automatic reservation of the legal questions raised by the motion conforms to the decision in *Baltimore & Carolina Line v. Redman*, 297 U.S. 654 (1935).

*See also Kay*, 709 F. App'x at 328; *Ford*, 535 F.3d at 492; *Am. & Foreign Ins. Co.*, 106 F.3d at 160; *Kusens*, 448 F.3d at 361.  Against the weight of this authority, Hanover presents no argument that the district judge has the authority to allow parties to preserve un-made, non-specific Rule 50(a) motions beyond the jury's verdict.  Therefore, even if that is what the district court intended to do, we hold that it had no power to do so.

While in general it is important that trial judges have wide latitude in the management of cases, to give so much latitude as to bless the procedure that (may have been) used here would create perverse incentives.  *See infra* pp. 26–27; *cf. K & T*, 97 F.3d at 176 (noting, in the context

of the standard of review, that deference to the trial judge is not desirable in review of Rule 50 motions). Finally, we find the case of *Tortu v. Las Vegas Metropolitan Police Department* instructive. In it, a defendant who had, as in our case, failed to make a Rule 50(a) motion at trial argued "that the district court induced him not to file the 50(a) motion" by means of an ambiguous statement that "constituted an instruction not to file a Rule 50(a) motion and therefore created an exception to the requirement of filing a Rule 50(a) motion." 556 F.3d at 1083. The Ninth Circuit found that this argument was "meritless," because the requirements of Rule 50 were clear, and ambiguous statements from the court could not "absolve" a litigant of his "procedural obligation[s]" under them. *Ibid.* We agree.[9] Moreover, Hanover cannot complain too much of unfairness: it knew enough to make an explicit Rule 50(a) motion at trial as to Brown despite the court's earlier statements. Falls, on the other hand, can complain of a great deal of unfairness: the case went to the jury on a theory that was very nearly the opposite of that on which Hanover prevailed after trial. *See infra* pp. 26–27.

### ii. Hanover's Policy Argument

Hanover's second argument is a policy argument: Even if it failed to make a Rule 50(a) motion, Hanover argues that its failure to do so should not cost it its Rule 50(b) motion because its Rule 50(b) motion concerns only matters of law. It is true that we have previously held that the distinction between questions of law and questions of fact can excuse a lapse under Rule 50, in two postures that were different than that in the present case. But we do not think that these precedents can—or should—stretch to create the rule that Hanover now seeks. To understand why, we begin by examining the law as it currently stands.

The Supreme Court has recently addressed the requirements of Rule 50 in a pair of decisions, *Unitherm Food Systems, Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394 (2006), and *Ortiz v. Jordan*, 562 U.S. 180 (2011). In *Unitherm*, the Court held that in the absence of a Rule 50(b) motion, a sufficiency-of-the-evidence challenge to a verdict made through a Rule 50(a) motion

---

[9]That case, and this one, might well be different if the district court had affirmatively and unambiguously *forbidden* counsel from making a Rule 50(a) motion at trial. *See Karam*, 383 F.3d at 426. In that case, error would lie in the manner in which the district court had conducted the trial. But short of that, the general rule that litigants must assert their own rights to preserve them continues to obtain.

cannot be reviewed on appeal.  546 U.S. at 400–01, 405–06.  In *Ortiz*, the Court reaffirmed this holding, 562 U.S. at 190–91, and further held that following a trial on the merits, a court of appeals generally cannot review the denial of a motion for summary judgment.  Several courts, including our own, have, however, held that *Unitherm*'s requirement of a Rule 50(b) motion to preserve an argument made in a Rule 50(a) motion for appeal does not apply to questions of pure law.  *See Doherty v. City of Maryville*, 431 F. App'x 381, 385 (6th Cir. 2011); *Fuesting v. Zimmer, Inc.*, 448 F.3d 936, 393–41 (7th Cir. 2006).  And *Ortiz* explicitly declined to decide whether its rule forbidding the post-trial appeals of motions for summary judgment extended to a "purely legal issues capable of resolution with reference only to undisputed facts."  562 U.S. at 190 (internal quotation marks omitted).  Our circuit has accordingly held that we can review a district court's summary-judgment decision on a "pure question of law" even after a jury verdict on the merits and in the absence of a properly made Rule 50 motion.  *In re AmTrust Fin. Corp.*, 694 F.3d 741, 751 (6th Cir. 2012) (distinguishing a contrary conclusion in *Doherty*, 431 F. App'x at 384, as dicta).[10]  Thus, while we have never before addressed the precise question that

---

[10]There is currently a significant circuit split on that question.  In addition to our circuit, the Second, Third, Seventh, Tenth, and D.C. Circuits have all held or reaffirmed after *Ortiz* that summary-judgment decisions may be appealed following a jury verdict on the merits if the question on appeal is one of pure law.  *See Vill. of Freeport v. Barrella*, 814 F.3d 594, 601 n.10 (2d Cir. 2016); *Frank C. Pollara Grp., LLC v. Ocean View Inv. Holding, LLC*, 784 F.3d 177, 185 (3d Cir. 2015); *Lawson v. Sun Microsystems, Inc.*, 791 F.3d 754, 761 & n.2 (7th Cir. 2015) (noting continued vitality of *Chemetall GMBH v. ZR Energy, Inc.*, 320 F.3d 714 (7th Cir. 2003), after *Ortiz*, and circuit split); *Chiddix Excavating, Inc. v. Colo. Springs Utils.*, 737 F. App'x 856, 859–60 (10th Cir. 2018); *Feld v. Feld*, 688 F.3d 779, 781–82 (D.C. Cir. 2012); *see also Williams v. Gaye*, 895 F.3d 1106, 1122 (9th Cir. 2018) (noting that *Ortiz* "calls into question the continuing viability" of the Ninth Circuit's rule on this point).  The First, Fourth, Fifth, and Eighth Circuits have taken the opposite position, forbidding review of any motion for summary judgment after a full trial on the merits, unless the issue has been preserved through properly made Rule 50 motions.  *See Jones ex rel. United States v. Mass. Gen. Hosp.*, 780 F.3d 479, 488–90 & 488 n.3 (1st Cir. 2015) (noting continued vitality of *Ji v. Bose Corp.*, 626 F.3d 116, 128 (1st Cir. 2010)); *Ihnken v. Jenkins*, 677 F. App'x 840, 843 (4th Cir. 2017) (citing *Chesapeake Paper Prods. Co. v. Stone & Webster Eng'g Corp.*, 51 F.3d 1229, 1235 (4th Cir.1995)); *Feld Motor Sports, Inc. v. Traxxas, L.P.*, 861 F.3d 591, 596 (5th Cir. 2017); *N.Y. Marine & Gen. Ins. Co. v. Cont'l Cement Co., LLC*, 761 F.3d 830, 838 (8th Cir. 2014).

Whichever way those circuits decided, each case is different from the case before us.  In these cases, the argument was first squarely presented in a motion for summary judgment and then the motion-loser asked the appeals court to review whether that summary-judgment motion should have been granted.  Indeed, this can be seen clearly in that some of these cases concern situations in which Rule 50(a) motions were made but not Rule 50(b) motions; others in which a Rule 50(a) motion was made but not on point; while in yet others no Rule 50 motions were made at all.  They are not, in short, truly cases about Rule 50 at all.

In the case before us, by contrast, no Rule 50(a) motion was made; instead, we have been asked to review a Rule 50(b) motion that was made (and granted).  Hanover, as the motion-loser at the summary-judgment stage, has not asked us to review the denial of its motion for summary judgment, nor did Hanover argue in its summary-judgment motion that TME's status as an additional insured means that Brown or TME's fraud voided Falls's

Hanover now raises—whether a Rule 50(b) motion that was made (and granted) in the complete absence of a Rule 50(a) motion can be upheld, provided it is on a pure question of law—we are not writing on a completely blank slate.

Hanover argues that this case is similar to *Doherty*. In that case, we confronted a situation in which the defendant had made a Rule 50(a) motion at trial, but "failed to renew its motion for judgment as a matter of law" (i.e., failed to make a Rule 50(b) motion) after trial. 431 F. App'x at 384. We held that the failure to renew a motion for judgment as a matter of law would not prevent appellate review of Rule 50(a) ruling concerning "purely legal" questions. *Id.* at 385–86. In doing so, we distinguished *Unitherm*, in which the Supreme Court held that a plaintiff must have made a renewed (50(b)) motion after the trial in order to preserve factual challenges for appellate review. *See* 546 U.S. at 401 ("[D]etermining whether a new trial should be granted or a judgment entered under Rule 50(b) calls for the judgment in the first instance of the judge who saw and heard the witnesses and has the feel of the case which no appellate printed transcript can impart."); *Doherty*, 431 F. App'x at 385 (quoting same).

*Doherty* rests on the reasoning that the trial court need not to have taken a *second* look at the legal questions in order for the appellate court to be able to pass on them, since the law is the specialty of the appeals court, while, as the Supreme Court observed in *Unitherm*, the facts are the province of the trial court. *See Doherty*, 431 F. App'x at 385 (discussing *Unitherm*, 546 U.S. at 401). But though that is sufficient reason to excuse the requirement to present the argument to the trial judge a *second* time before appeal, after the verdict has been given, it does not stretch far

property coverage; rather, Falls is asking us to review the district court's grant of Hanover's Rule 50(b) motion, made without a predicate Rule 50(a) motion.

Though these cases are distinguishable, they have added to our analysis of this case. *See infra* pp. 28–29. Therefore, it is worth noting that while some courts have seen the critical distinction as that between sufficiency-of-the-evidence challenges and all others, our court in *Kay* saw it as between "purely legal issues" (or "pure question[s] of law") on the one hand and all other issues on the other. 562 F. App'x at 384–85 (quoting *Ortiz*, 562 U.S. at 190, and *In re AmTrust*, 694 F.3d at 751). We termed this residual category (of all issues that are not "pure questions of law") as "factbound." *Kay*, 562 F. App'x at 385. This different terminology reflects an important conceptual distinction. "Purely legal questions," in the sense meant by *Ortiz*, involve "disputes about the substance and clarity of pre-existing law." *Ortiz*, 562 U.S. at 190. These "are abstract legal questions, which can be asked and answered without reference to the facts of the case." *Kay*, 562 F. App'x at 385. After a trial, it is appropriate, under *Ortiz*, to *at most* revisit only this "abstract" type of question. Anything else, even many legal arguments, can become liable to be mixed up in the facts developed at trial, and so become "factbound."

enough to excuse a failure to present it a *first* time, before the case has gone to the jury.  The point of presenting it the first time is not only to present the argument underlying the Rule 50(a) motion to the judge, but also to opposing counsel, and so give them time to remedy any defects in their case before it goes to the jury.[11]  As one of our sister circuits has noted, the importance of this notice goes beyond simply providing an opportunity to remedy evidentiary gaps:

> By requiring a litigant to raise all arguments in its initial Rule 50(a) motion, the trial court is able to re-examine the question of evidentiary insufficiency as a matter of law if the jury returns a verdict contrary to the movant, and opposing counsel is alerted to any insufficiency before the case is submitted to the jury, giving the opposing party a chance to *cure any defects in its legal theories* or proof should the motion have merit.

*Puga v. RCX Sols., Inc.*, 922 F.3d 285, 291 (5th Cir. 2019) (cleaned up) (emphasis added); *cf.* Fed. R. Civ. P. 50(a) ("The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment.").

In Hanover's view, none of this is a problem.  In an adaptation of *Doherty*'s trial court-appellate court distinction, it argues that as its Rule 50(b) motion went to a question of law, and the jury's province is the facts, the argument can be presented to the judge after the verdict instead of before.  But there are several problems with this.

First and foremost, it goes against the plain meaning of the Rule, and the explicit instructions in the Notes to the Rule.  *See supra* pp. 15–17.  It would replace a bright-line rule with a new, unclear, and uncertain standard.  Second, there is a constitutional issue.  The Rule 50 procedure has been held to be consistent with the Seventh Amendment's guarantee of a jury trial in civil suits because the first motion, under Rule 50(a), "requir[es] that parties raise important issues *before* the case is submitted to the jury.'"  *Kay*, 709 F. App'x at 328 (quoting *Ford*, 535 F.3d at 492 (quoting *Am. & Foreign Ins. Co.*, 106 F.3d at 160)).  Rule 50(b) therefore allows a reservation of a ruling on such a motion, which was made *before* the case went to verdict, until after the verdict.  *See* 9B CHARLES ALAN WRIGHT & ARTHUR MILLER, FEDERAL PRACTICE

---

[11]Similarly, whatever one thinks of our exception allowing review, after a jury verdict, of the denial of summary judgment on questions of pure law, which is embraced by some of our sister circuits, in those cases the motion for summary judgment did present the issue squarely.

& PROCEDURE § 2522 (3d ed.).  That distinction, while fine, has been held to be critical.  The upshot is that "the right to trial by jury might be implicated if no Rule 50(a) motion had been made."  *Unitherm*, 546 U.S. at 408 (Stevens, J., dissenting).

Third, Hanover's proposed rule would create perverse incentives.  Right now, anyone who wants to be able to make a motion for judgment as a matter of law in the future must make one before the jury.  That provides strong incentives to lay one's cards on the table and enables the other side to counter them.  Under Hanover's proposed rule, by contrast, there is an incentive to hold back a legal argument in reserve.  Jury trials are already expensive and time-consuming: they ought to be a show-down moment when at all possible.

The danger that Hanover's proposed rule would create can be clearly seen with reference to the facts of this case.  In particular, when conferring over the proposed jury instructions, the trial judge made it clear—and Hanover did not object—that the jury instructions and verdict form would be structured so as to address *separately* whether *each* defendant had made a material misrepresentation leading to a payment from Hanover:

> THE COURT:  You must determine whether reliance upon the representation substantially influenced Hanover's actions, even though other -- well, and the question for Mr. Futhey [Falls's counsel] and for Mr. Morris [Mott's counsel] -- and for Mr. Morris was do we need to be more clear about the misrepresent – it's the misrepresentation of the defendant that you're considering.  I don't want it to be unclear in that regard.  They may believe that Mr. Falls did not misrepresent.  They may feel very differently about Mr. Falls -- I don't want to pick on you, Mr. Brown – than you.  They may.  They may feel very differently about that and the same thing with Mr. Mott.
>
> So, maybe we need to say something about that.  In other words, Hanover would not have issued the insurance policy you are considering but for the -- or made payments to the defendant you're considering without -- and then the question:  Is that defendant's misrepresentation or misrepresentations?

Hanover could have objected and requested a jury instruction as to whether Brown's misbehavior could void Falls's policy.  It could have requested that the verdict form be structured so as to tie the issues together.  It did neither.  Thus, all parties sent the case to the jury with each party's *own* misrepresentations isolated from the others and tied to its own individual liability.  The jury instructions explained that "Hanover claims that *each* Defendant/Counter-

Plaintiff breached and voided *his* insurance policy by making material misrepresentations in . . . the claim of loss." The instructions also explained that Hanover had "refused to pay under the policy because it claims that *the policyholder* breached and voided the policy by making material misrepresentations in the claim for loss." And the jury verdict form separated clearly the actions and liabilities of all three defendants—mapping the principle of separability the judge had laid out in conference and in his instructions.

Just as the judge had speculated that it might, the jury *did* "believe that Mr. Falls did not misrepresent" but "feel very differently about . . . Mr. Brown." Then, having allowed the case to go to the jury on this basis, without the notice that a Rule 50(a) motion would serve, Hanover turned around and argued the opposite post-trial. (And the district court seemingly reversed course.) Behavior of this sort, sometimes called "lying in the weeds" or "sandbagging," should be strongly discouraged. Even if it was inadvertent in this case, it might not be in future cases, were we to adopt Hanover's proposed rule.

Fourth, Hanover's policy argument has a problem because it is unclear that the argument truly is, as claimed, purely legal. Hanover's brief is replete with arguments that seem quite factual. To take one example, in the midst of arguing that Falls knew that the basis for its Rule 50(b) motion was a contested area of law, Hanover writes that "it is important to note that the claims under the three policies at issue *are not factually separable*." If its legal theory turns on that point, then it is not a legal theory at all—it is a factual one. Likewise, Hanover writes that "Falls does not identify a single piece of evidence or testimony that the jury could have relied on to conclude that Brown's fraud was artificially limited to Brown/TME's and Mott's insurance claims." If the court, in assessing Falls's claims, is supposed to be looking for "evidence or testimony"—whether or not it can find any—then it is assessing a factual, not a legal, claim.

Similarly, an important part of Falls's merits argument (presented to us, though we need not decide it) concerns a question of materiality: Falls argues that the jury may have felt that Brown's misrepresentations, even if they could in principle void Falls's coverage, were not material to it. Materiality appears to be a mixed question of fact and law in Tennessee. In *Wassom v. State Farm Mut. Auto Ins. Co.*, which also concerned a post-loss misrepresentation,

the court quoted with approval 46A C.J.S. Insurance § 1249: "The materiality of false representations to an insurance company for recovery on a claim is a mixed question of law and fact which can be decided as a matter of law if reasonable minds could not differ." 173 S.W.3d 775, 781 (Tenn. Ct. App. 2005). The question of materiality in this case is one on which reasonable minds could disagree. Therefore, Hanover's theory would be for the jury—i.e., it is not purely legal—for this reason also.

This should not, perhaps, be surprising. We have previously noted that our exception to Rule 50's requirements, which would allow for review of summary-judgment motions on "pure questions of law" after a jury verdict, was exceptionally narrow, covering only truly abstract questions that "can be asked and answered *without reference to the facts of the case*." *Kay*, 562 F. App'x at 385 (emphasis added). Just because a question is a "legal question" in the general sense does not mean that it will fit into such a narrow bound. *See ibid*. Many legal questions, rather, will look quite different after developments at trial. (Looking at the record of the trial before us, for instance, we see that Hanover's party representative testified directly to the contractual construction issue at question.) Therefore, once there has been a trial, this suggests that we ought to require the Rule 50(a) motion to have been made, so that the judge and litigants had the opportunity to tease out the interaction between law and proof on any issue that still remains live after the summary-judgment stage. Meanwhile, the existence already of our exception to Rule 50 for review of summary-judgment rulings on pure legal questions means that there is a safety valve for arguments that truly do go to "pure questions of law."[12]

---

[12]Of course, today's ruling does not put all legal arguments out of reach except through the means of a Rule 50 motion. To the contrary, "[i]f there have been errors at the trial, duly objected to, dealing with matters other than the sufficiency of evidence, they may be raised on appeal from the judgment even though there has not been either a renewed motion for judgment as a matter of law or a motion for a new trial." *Bullard v. Alcan Aluminum Corp.*, 113 F. App'x 684, 688 (6th Cir. 2004) (quoting 9A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2540, p. 366 (2d ed. 1995)). This means, in effect, that normal appeals from, e.g., evidentiary rulings remain intact.

But here we are dealing with the very issue to which a Rule 50 motion is supposed to apply: the argument that, under the undisputed facts, as a result of the operation of law only one jury verdict is rational or possible. *Cf. Unitherm*, 546 U.S. at 404 ("[T]he precise subject matter of a party's Rule 50(a) motion—namely, its entitlement to judgment as a matter of law—cannot be appealed unless that motion is renewed pursuant to Rule 50(b)."). For that argument, just as with a sufficiency-of-the-evidence challenge, a Rule 50 motion is the correct vehicle. Consequently, a failure to use it properly—Rule 50(a) motion first before jury deliberations, then Rule 50(b) motion after the verdict—will prevent a litigant from succeeding.

Finally, common sense suggests that, in light of our extensive case law regulating how similar a Rule 50(a) motion and the subsequent Rule 50(b) motion must be for the latter to be permissible, it would be bizarre to allow litigants to proceed who made no Rule 50(a) motion at all. In *Ford*, in holding that a 50(b) motion was too dissimilar from the litigant's 50(a) motion to be allowed to go forward, we wrote that "[w]ere we to conclude that the [litigant's] preverdict motion in this case constitutes the requisite 'specific grounds' for the issue raised in its post-verdict motion, that requirement would as a practical matter cease to provide any limitation at all." 535 F.3d at 493. We could hardly then say: But if the litigant had made no Rule 50(a) motion at all, we would be happy to hear the Rule 50(b) motion.

We therefore see no reason to create an exception for questions of law to Rule 50's requirement that a Rule 50(a) motion must precede a Rule 50(b) motion. We hold that Hanover forfeited its Rule 50(b) motion by not making a Rule 50(a) motion, which is not allowed based on a plain reading of the rules, due to constitutional concerns, due to our case law, and for policy reasons. Because we do not ordinarily examine claims that have been forfeited, we do not proceed to the merits underlying the Rule 50(b) motion. *See Ford*, 535 F.3d at 493–94.[13] Rather, we turn briefly to alternative grounds that Hanover raises for affirming the court below.

## B. Sufficiency-of-the-Evidence Challenge

Hanover makes a last-ditch argument that we should affirm the entry of judgment against Falls on the alternative grounds that "there is absolutely no evidence" to support the jury verdict in his favor. But this is nothing more than a factual argument as to the sufficiency of the evidence—the one thing that even Hanover concedes requires a Rule 50(a) motion to be made at trial, followed by a Rule 50(b) motion afterward, in order to be preserved for appeal.

---

[13]We note, however, that we have serious doubts about the district court's conclusion that Brown's fraud unambiguously voided Falls's BPP coverage based on TME's status as an additional insured under an endorsement in a separate part of the policy given (1) the structure of the policy and language of the relevant provisions, and (2) Hanover adjuster Gary Barkman's testimony specifically contradicting the district court's interpretation of the policy.

*See Unitherm*, 546 U.S. at 400–01; *Doherty*, 431 F. App'x at 384–86.[14] This argument is therefore also forfeited.

### C. Tennessee Public Policy

The jury awarded Falls $2,500,000 as the amount of insurance he was owed, up to his policy limit, for Business Personal Property coverage and $250,000 as the balance of the Business Income insurance he was owed. (Along with the $250,000 he was already advanced and under the verdict would not have to pay back, this amount brought the BI payout up to his policy maximum of $500,000.) The BPP payment covers the loss of the gear in Falls's studio. However, Brown is the ultimate owner of the lost gear, on which Falls had a perpetually renewable leasehold.

Therefore, Hanover argues, payment of the $2,500,000 would violate public policy, because Brown would ultimately benefit from his own wrongdoing. It is an "ancient equity maxim that no one should benefit from his own wrongdoing." *K & T*, 97 F.3d at 178. The Supreme Court of Tennessee recognized the application of this principle in insurance cases in *Box v. Lanier*, 79 S.W. 1042, 1045 (Tenn. 1904). "No one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime." *Ibid.*

The public-policy argument, however, even if accepted, does not mean that Falls takes nothing of the $2,500,000 BPP award. Falls had a property interest in the "gear," in the form of his leasehold with unlimited renewal options.[15] Leaseholds have been held to be insurable

---

[14]*See also Eveland v. Star Bank, N.A.*, 188 F.3d 507, 1999 WL 644346, at *2 (6th Cir. 1999) (table) (Plaintiff failed to make "a motion for a directed verdict at the end of evidence. By failing to make this motion, plaintiff did not preserve her right to challenge the sufficiency of the evidence supporting the jury verdict."); *Morganroth & Morganroth v. DeLorean*, 123 F.3d 374, 383 (6th Cir. 1997) (holding that defendant had waived his sufficiency-of-the-evidence arguments "by failing to raise them below in a timely motion for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure." (citing 9A WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 2536 (2d ed. 1995))). These cases predated *Unitherm* and the 2006 Amendment to Fed. R. Civ. P. 50, but neither authority changes the logic of these rulings; indeed, the subsequent developments are consonant with our precedents.

[15]As Falls stated at trial: "[T]here's the unresolved matter of the fact that I had a lease for equipment and a space. That equipment had monetary value to me that I have been out now for three years." *Cf. State of Tenn. ex*

interests. More to the point, Hanover clearly accepted at trial that Falls had at least an arguable property interest: Barkman testified at trial that the payment for BPP under the Falls policy would go to Falls and Brown jointly. Thus, Barkman said, it would have to be endorsed by Brown to be cashed by Falls. As Falls's counsel explained to us at oral argument, the proceeds will become the subject of an interpleader action between Falls, Brown, Hanover, and Brown's other creditors.

This was the district court's plan for how to handle the issue: Falls and TME would "sue each other" in the event of a win, but not fight it out during the main trial. Though Falls and Hanover both make interesting legal arguments as to the dispositions of the funds, we see no reason to short-circuit that plan. Such arguments can be made in whatever subsequent proceedings arise over this payment.

## CONCLUSION

For the foregoing reasons, we DENY Hanover's motion to dismiss these appeals and AFFIRM the judgments of the court below as to Brown/TME, Nos. 19-5550 & 19-5551, and Mott, 19-5562. But we REVERSE as to Falls, No. 19-5483, and REMAND with instructions to reinstate the jury verdict on the grounds that Hanover had forfeited its Rule 50(b) motion by not bringing a Rule 50(a) motion.

---

*rel. Dept. of Trans. v. Gee*, 565 S.W.2d 498, 501–02 (Tenn. Ct. App. 1977) (discussing, in the context of a takings case, the proper calculation of the property value of a leasehold).